COMMONWEALTH *vs.* SARAH J. ROBINSON.

Middlesex.    April 2, 1888. — May 3, 1888.

Present : MORTON, C. J., DEVENS, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Murder — Evidence — Antecedent Acts.*

Antecedent acts rendering the commission of a crime easier, safer, more certain, and more effective to accomplish an object, if done with that intention and purpose, are so connected with the crime as to be admissible at the trial of an indictment therefor, although themselves criminal.

It is for the presiding judge at the trial to decide, in the first instance, whether there is proof enough to connect such acts with the crime alleged so as to render evidence thereof admissible, in determining which it is only necessary that there should be so much proof as to make it proper to submit the whole evidence to the jury, and not that he should be satisfied beyond a reasonable doubt.

At the trial of a woman indicted for murder, it appeared that the deceased was insured in a beneficiary association, his wife, who was the prisoner's sister, being

MAY, 1888.

the beneficiary; that the wife died after an illness of about three weeks; that immediately after her death the insured went to live with the prisoner and duly made her his beneficiary; that he died soon after by arsenic, being ill about six days; and that the prisoner, who from a period prior to the wife's death had been harassed by creditors, received the insurance money, and out of it paid off her debts. To prove a scheme on the prisoner's part to obtain the insurance first through a murder of the wife and then of the husband, evidence was offered that before the wife's death the prisoner knew of the insurance; that during the wife's illness she expressed the opinion that her sister would never recover, saying that she had had a terrible dream, and that when she had such a dream one of the family always died; that before, as well as after, the death of the insured, she expressed a wish to have him live with her, and asked others to urge him to do so; that on the day of the wife's funeral she said that his sister wished him to live with her so as to get the insurance, but that she, the prisoner, had the best right to it and wanted it; that on the same day she asked the insured if the insurance was made over to herself, and afterwards said she was afraid it would not be; that on the day the insured was taken ill, and afterwards, she sent to the association to see if the papers were right, and if she would get the insurance in case anything happened to him; that she was told before his death by the secretary that the papers were all right; and that she asked the secretary not to tell his sister about the insurance. *Held,* that the evidence was sufficient to warrant the introduction of further evidence that the prisoner poisoned the wife.

INDICTMENT for the murder of Prince Arthur Freeman by poisoning. At the trial, before *Field* and *Knowlton*, JJ., there was evidence tending to prove the following facts.

In February, 1885, Freeman occupied a tenement in South Boston with his wife, Annie Freeman, who was a sister of the defendant, and their two children. On February 20, 1885, the defendant called upon her sister, staying but a short time, and on February 23, 1885, again went to her sister's house to take care of her, and there stayed until Mrs. Freeman died, on February 26, 1885, after an illness of about three weeks. The children had been taken to the defendant's house in Cambridge on February 22, and, immediately after the death of his wife, Freeman went to live with the defendant, and there remained, with his children, one of whom died in April, 1885. In 1882 Freeman took out a certificate of insurance for $2,000 in the United Order of Pilgrim Fathers, his wife being the beneficiary named in the certificate, and after her death, on or about May 13, 1885, appointed the defendant his beneficiary under the certificate, as authorized by the by-laws of the order. Freeman, while still an inmate of the defendant's family, died, on June 27, 1885, after an illness of about six days, from the effects of arsenic

administered to him by the defendant. From a period prior to 1885, the defendant had been indebted to different persons to the amount of six or seven hundred dollars, which she was unable to pay, and for which she had been hard pressed by her creditors, and this indebtedness she paid off out of Freeman's insurance, which she duly received from the order on September 23, 1885.

The government contended — and offered, for the sole purpose of establishing the defendant's motive in killing Freeman, evidence to prove — that prior to the death of Annie Freeman the defendant had formed the plan and intention of securing to her own use the $2,000 of insurance, and as a means of accomplishing this result, and as a part of the scheme, determined first to kill her, then to induce Freeman to make her the beneficiary under the certificate, and then to kill him. Upon this offer the court ruled as follows: " If evidence direct or circumstantial is offered and admitted tending to show that this defendant knew before her sister's death of the existence of the insurance, and that it could be transferred on the death of her sister to herself, and made payable to herself on the death of her brother-in-law, and that she before her sister's death had formed in her own mind a plan or intention to obtain this insurance for her own benefit, and this plan or intention continued to exist and be operative up to the time of the death of the brother-in-law, then we are of the opinion that evidence may be offered that her sister died of poison, and that this defendant administered it as a part of the method employed by her to carry this plan or intention into effect, in connection with evidence that she administered poison to her brother-in-law as another part of the same plan or intention. We think that evidence of this knowledge and plan or intention on the part of the defendant, if there be any, should first be offered, that the court may judge whether it is sufficient to warrant the introduction of evidence that the sister died of poison administered by the defendant."

The government thereupon offered evidence to prove such a scheme on the part of the defendant, which was admitted. This contention of the government, and offer of evidence of the alleged scheme and intention of the defendant, the arguments of counsel, and the above ruling of the court thereon, were all made in open

court, in the presence of the defendant, but in the absence of the jury.    The evidence so far as material was as follows.

Susan S. Marshall testified that the defendant remarked to her that Prince Arthur Freeman was insured in or had joined the order about the time he joined it in 1882; that during the sickness of Mrs. Freeman, at the defendant's request, she assisted in taking care of her; that while she was there the defendant expressed the opinion that Mrs. Freeman would not live; and that immediately after Mrs. Freeman's death the defendant requested her to use her influence with Freeman to take his children and come to live with her.

Mrs. Mary J. Wright testified that she lived in the same house with Mrs. Freeman in South Boston at the time of her death; that she frequently saw the defendant while she was taking care of her sister; that she frequently heard the defendant say, before her sister's death, that she was satisfied her sister would never recover; that on one occasion the defendant said that she had had a terrible dream, and that she knew her sister would never get any better, as whenever she had a dream like that there was always one of the family died, and that she knew her sister would never recover; that at the time the defendant came, Mrs. Freeman seemed to be getting better, when, all at once, she seemed to sink very fast; that the defendant asked her, before and after Mrs. Freeman's death, to use her influence with Freeman to come and live with her with the children after her death; that on one occasion the defendant requested Freeman to go into the chamber where his wife was, and when she came out she said, " There, I have fixed it all right now, — any little rings, or anything that Annie has, I have had distributed so that there will be no trouble if anything should happen to her, and the children are to come to me "; and that the defendant expressed the opinion that Mrs. Freeman would not recover, and within a day or two after she came to take care of her said to various persons who came in that her sister would never recover.

Mary L. Moore testified that on three occasions during Mrs. Freeman's sickness, and while the defendant was there, she took care of her during the night; that the defendant did not seem to think her sister would recover; that the defendant desired her to use her influence with Freeman to come and live with her

after his wife's death; that Freeman's life was insured, and that it was in her sister's name; and that after Mrs. Freeman's death the defendant told her that the Freemans were going to live with her, and that she did not wish them to live with his relatives.

Belle M. Clough testified, that she was an intimate friend of the defendant's family; that she attended the funeral of Mrs. Freeman at South Boston, and returned in a carriage with the defendant from the cemetery; that on the way she had a conversation with the defendant about the insurance, and the Freemans living with her; that the defendant said she wished them to live with her, but that Mrs. Melvin, a sister of Freeman, was very anxious to have him live with her; that the defendant said that all Mrs. Melvin wanted was to get the insurance made over to her, but that she had the best right to it, and it was her sister's request that it should be made over to her, and she wanted it; that the defendant said that she had requested her daughter to use all her influence upon her uncle to go and live with them, as her daughter had a great deal of influence over him; that at the supper after the funeral at Freeman's house, the defendant had a conversation with him about the insurance; that she was very anxious to have him come as soon as possible to her house to live, and he said that he would come just as soon as he could get the things at the house straightened out; that the defendant wanted to know if the insurance was made over to her, and he said it was not, but should be; that the defendant said that his mother and sister were anxious to have him come with them now that they saw he had an insurance, but before that they did not care anything about him; that the subject of insurance was afterwards quite frequently spoken of by the defendant, who said that she was afraid that Freeman would not make the insurance over to her; that he was going over to his folks every Sunday, and she thought they had a good deal of influence over him, as he had changed considerably, and was not as pleasant at the house with her; that on the evening that Freeman was taken sick, June 22, the defendant asked the witness to go over to Boston with the defendant's daughter, to a colony of the order of which he was a member, to see if all the papers were right in case anything happened to him, whether the defendant

would get the insurance, and if all the assessments were paid up; that the defendant sent over to see about the insurance once or twice afterwards before his death; and that some time after Freeman's death the defendant said that the insurance was made over to her to take care of the child, and that after she had paid all of Freeman's bills there was very little left for the boy.

Florence A. Stanwood testified, that she was secretary of the colony of which Freeman was a member, and went over to the defendant's house the day before Freeman's death, because of a message from her daughter and the witness Clough; that there was a conversation about the insurance in the presence of the defendant and Freeman; that she informed them that the papers were all right; that after the interview the defendant went with her into the parlor, and there requested her not to tell about the insurance; and that the defendant said that Mrs. Melvin, as soon as there was some money coming, would want to take care of the children for the sake of it.

William Foster testified, that he was at the defendant's on the day of Mrs. Freeman's death, and had a conversation with the defendant, who said that there was an insurance of two thousand dollars in the colony of the Pilgrim Fathers, and that the insurance had been made over to her; that she would not have taken Freeman if the insurance had not been made over to her; that probably Freeman's friends would want the insurance papers, but that she did not think they would find them, for they had been put away where she thought they would be unable to get them.

The government offered evidence tending to prove the death of Annie Freeman by arsenic, knowingly administered by the defendant.

The defendant objected to the admission of this evidence, on the ground that no evidence, and no sufficient evidence, had been offered to prove the alleged scheme and intention of the defendant; that no sufficient foundation had been laid for the introduction of any evidence relating to the cause of the death of Annie Freeman, or the defendant's connection therewith; and that it was not competent, notwithstanding any evidence of the scheme or intention, to prove the cause of the death of Annie

Freeman, or the defendant's connection therewith; but the court overruled the objection, and admitted the evidence.

The court ruled, and instructed the jury, that, upon a trial of a defendant for the commission of a crime, evidence that at another time he committed a similar crime could not be received or considered as tending to show that he committed the crime for which he was on trial; that evidence tending to show that the defendant killed her sister, Annie Freeman, was not to be considered as indicating that she would be likely to kill Prince Arthur Freeman; and that all the evidence in relation to the death of Annie Freeman was only to be considered so far as it bore upon the question whether the defendant, at the time of the alleged murder of Prince Arthur Freeman, was actuated by the motive which was imputed to her by the Commonwealth, to obtain for her own use the life insurance money payable on his death.

The jury returned a verdict of guilty; and the defendant alleged exceptions.

*J. B. Goodrich & D. F. Crane*, for the defendant.

*A. J. Waterman*, Attorney General, (*H. C. Bliss*, Assistant Attorney General with him,) for the Commonwealth.

C. ALLEN, J. We have given to this case a degree of attention commensurate with its importance, and have come to the conclusion that there was no error in the conduct of the trial.

While it is well settled in this Commonwealth, that, on the trial of an indictment, the government cannot be allowed to prove other independent crimes for the purpose of showing that the defendant is wicked enough to commit the crime on trial, this rule does not extend so far as to exclude evidence of acts or crimes which are shown to have been committed as part of the same common purpose, or in pursuance of it. *Commonwealth* v. *Jackson*, 132 Mass. 16, 18. *Commonwealth* v. *Blood*, 141 Mass. 571, 575. In such cases there is a distinct and significant probative effect, resulting from the continuance of the same plan or scheme, and from the doing of other acts in pursuance thereof. It is somewhat of the nature of threats or declarations of intention, but more especially of preparations for the commission of the crime which is the subject of the indictment. If, for example, it could be shown that a defendant had formed a settled

purpose to obtain certain property, which could only be got by doing several preliminary things, the last of which in the order of time was criminal, the government might show, on his trial for the commission of that last criminal act, that he had formed the purpose to accomplish the result of obtaining the property, and that he had done all of the preliminary things which were necessary to that end. This would be quite plain if the evidence of the purpose were direct and clear; as if a letter in the defendant's handwriting should be discovered, stating in terms to a confederate his purpose to obtain the property by the doing of the several successive acts, the last of which was the criminal act on trial. In such case, no one would question that proof might be offered that the defendant had done all the preliminary acts referred to, which were necessary steps in the accomplishment of his purpose. But such purpose may also be shown by circumstantial evidence. It is, indeed, usually the case, that intentions, plans, purposes, can only be shown in this way. Express declarations of intention, or confessions, are comparatively rare; and therefore all the circumstances of the defendant's situation, conduct, speech, silence, motives, may be considered. The plan itself, and the acts done in pursuance of it, may all be proved by circumstantial evidence, if they are of themselves relevant and material to the case on trial. And in such a case it makes no difference whether the preliminary acts are criminal or not; otherwise, the greater the criminal, the greater his immunity. Such preliminary acts are not competent because they are criminal, but because they are relevant to the issue on trial; and the fact that they are criminal does not render them irrelevant. Suppose, for further example, one is charged with breaking a bank, and there is evidence that he had made preliminary examinations from a neighboring room; the fact that his occupation of such room was accomplished by a criminal breaking and entering would not render the evidence incompetent. It is sometimes said that such evidence may be introduced where the several crimes form part of one entire transaction; but it is perhaps better to say, where they have some connection with each other, as a part of the same plan, or induced by the same motive. Precedent acts which render the commission of the crime charged more easy, more safe, more

certain, more effective to produce the ultimate result which formed the general motive and inducement, if done with that intention and purpose, have such a connection with the crime charged as to be admissible, though they are also of themselves criminal.

We do not understand that this general view, stated thus, is distinctly controverted by the counsel for the prisoner, and it is supported by a great number of decisions, only a few of which are here cited. *Commonwealth* v. *Scott,* 123 Mass. 222. *Commonwealth* v. *Choate,* 105 Mass. 451. *Swan* v. *Commonwealth,* 104 Penn. St. 218. *Goersen* v. *Commonwealth,* 99 Penn. St. 388. *Shaffner* v. *Commonwealth,* 72 Penn. St. 60. *Mayer* v. *People,* 80 N. Y. 364, 375. See also *Jordan* v. *Osgood,* 109 Mass. 457. For cases where such connection was not shown, but where the principle was recognized, see *Commonwealth* v. *Jackson,* 132 Mass. 16; *State* v. *Lapage,* 57 N. H. 245, 295; *People* v. *Sharp* (opinion by Peckham, J.), 107 N. Y. 427, 466.

The ruling at the trial, therefore, was correct, that if evidence should be offered and admitted tending to show that the prisoner knew before her sister's death of the existence of the insurance, and that it could be transferred on the death of her sister to herself, and made payable to herself on the death of Freeman, and that before her sister's death she had formed a plan or intention to obtain this insurance for her own benefit, and this plan or intention continued to exist or be operative up to the time of Freeman's death, then that evidence might be offered to show that her sister died of poison, and that the prisoner administered it as a part of the method employed by her to carry this plan or intention into effect, in connection with evidence that she administered poison to Freeman as another part of the same plan and with the same general intention. The court therefore properly held that evidence of this knowledge and plan or intention on the part of the prisoner should first be offered, that the court might judge whether it was sufficient to warrant the introduction of evidence that the sister died of poison administered by the prisoner. This claim and offer of proof on the part of the government, and the arguments of counsel, and the said ruling of the court thereon, were all made in open court, in the prisoner's presence, but in the absence of the jury.

The government accordingly proceeded to introduce, with its other evidence to the jury, certain testimony in support of said alleged scheme or intention on the part of the prisoner, which is recited in the bill of exceptions; and after said testimony had been received, it offered evidence tending to prove the death of the prisoner's sister by arsenic, knowingly administered by the prisoner. This evidence was objected to, on the ground that no sufficient evidence had been offered in proof of said alleged scheme or intention, and on other grounds; but the court over-ruled the objection, and admitted the evidence, subject to the prisoner's exception.

In seeking a new trial on account of the admission of this testimony, the argument of the prisoner's counsel, briefly stated, is as follows: Preliminary evidence must be given to show that the acts offered to be proved were done in pursuance and as a part of some plan or scheme to accomplish the particular result; it is the exclusive province of the court to determine if such evidence is sufficient; the decision of the court, admitting the evidence, is subject to revision in the present case, the testimony upon which that decision was founded having been reported for the purpose; it is not enough that there was some evidence, but the preliminary evidence must amount to proof; the ruling of the court did not expressly affirm the necessity of such proof, that is, as we understand the argument, the necessity of such amount or degree of proof; and, finally, this court, upon a re-vision of the preliminary evidence reported, should now hold that it was not sufficient to warrant the introduction of evidence to show that the prisoner poisoned her sister, Mrs. Freeman. The last three of these propositions are the only ones which need any further attention.

A consideration of the nature of the question which is pre-sented to the court, when it is called upon to decide upon a preliminary question of fact, in order to determine whether offered evidence shall be received, will show that its determi-nation reaches no further than merely to decide whether the evidence may or may not go to the jury. The decision upon this particular question of the admissibility of the evidence is ordinarily conclusive, unless the judge sees fit to reserve or report the question for future revision. *Dole* v. *Thurlow*, 12

Met. 157. *Gorton* v. *Hadsell*, 9 Cush. 508, 511. *O'Connor* v. *Hallinan*, 103 Mass. 547. *Walker* v. *Curtis*, 116 Mass. 98. And in this respect the rule is the same in criminal cases. *Commonwealth* v. *Hills*, 10 Cush. 530. *Commonwealth* v. *Mullins*, 2 Allen, 295. *Commonwealth* v. *Morrell*, 99 Mass. 542. *Commonwealth* v. *Culver*, 126 Mass. 464. *Commonwealth* v. *Gray*, 129 Mass. 474.

But where, in a case like the present, the admissibility of testimony depends upon the determination of some prior fact by the court, there is no rule of law that, in order to render the testimony admissible, such prior fact must be established by a weight of evidence which will amount to a demonstration, and shut out all doubt or question of its existence. It is only necessary that there should be so much evidence as to make it proper to submit the whole evidence to the jury. The fact of the admission of the evidence by the judge does not in a legal sense give it any greater weight with the jury; it does not affect the burden of proof, or change the duty of the jury in weighing the whole evidence. They must still be satisfied, in a criminal case, upon the whole evidence, beyond a reasonable doubt. Ordinarily, questions of fact are exclusively for the jury, and questions of law for the court. But when, in order to pass upon the admissibility of evidence, the determination of a preliminary question of fact is necessary, the court in the due and orderly course of the trial must necessarily determine it, as far as is necessary for that purpose, and usually without the assistance, at that stage, of the jury. If, under such circumstances, testimony is admitted against a party's objection, it may often happen that he may still ask the jury to disregard it.

Numerous illustrations of the foregoing view might be given, but a few must suffice us. In an indictment for murder, where the question was as to the admissibility of certain statements in the nature of confessions, which were objected to as having been obtained by means of inducements, it was held by this court as follows: "When a confession is offered in a criminal case, and the defendant objects that he was induced to make it by threats or promises, it necessarily devolves upon the court to determine the preliminary question whether such inducements are shown. . . . . If the presiding judge is satisfied that there were such

inducements, the confession is to be rejected; if he is not satisfied, the evidence is admitted. But if there is any conflict of testimony or room for doubt, the court will submit this question to the jury with instructions that if they are satisfied that there were such inducements, they shall disregard and reject the confession." *Commonwealth* v. *Piper*, 120 Mass. 185, 188. Similar questions arise when it is objected that a witness is not of sufficient capacity to testify intelligently; or that a third person, whose declarations or acts are offered in evidence against a party, was not a partner, agent, or co-conspirator, and did not stand in such a relation as to make his declarations or acts admissible; and in other cases.

In *Commonwealth* v. *Brown*, 14 Gray, 419, which was an indictment for causing the death of a woman by means of an attempt to procure a miscarriage, the judge at the trial decided, as matter of fact, on the preliminary question, that there was *prima facie* evidence that the defendant and two other persons were jointly acting in combination and concert, and aiding and assisting each other in carrying out a common enterprise of procuring an abortion, so as to make the acts and declarations of those two persons competent, and admitted the evidence; and then left the question to be determined by the jury whether they were acting in concert with the defendant or not, with instructions that, if so, the acts and declarations might be considered by them, otherwise not. This course was held by this court to be correct (pp. 425, 426, 432); the court saying, " The conspiracy of the parties was first satisfactorily made to appear to the court." In *Commonwealth* v. *Crowninshield*, 10 Pick. 497, a similar doctrine was held.

In all such cases, the court, in deciding to admit the offered testimony, does no more than to hold that enough has been shown to make it proper to submit the testimony to the jury, leaving its weight and credit for their determination. The decision of the judge does not relieve the party offering the testimony from the necessity of establishing every material fact to the satisfaction of the jury. See also *Commonwealth* v. *Scott*, 123 Mass. 222, 235; *Commonwealth* v. *Waterman*, 122 Mass. 43, 59; *Commonwealth* v. *Preece*, 140 Mass. 276; *Ormsby* v. *People*, 53 N. Y. 472; *Swan* v. *Commonwealth*, 104 Penn. St. 218.

1 Greenl. Ev. §§ 49, 111. Steph. Ev. (Chase's ed.) art. 4. In this view of the law, it was not necessary that the court should find that the preliminary evidence amounted to full proof, beyond a reasonable doubt, that the prisoner poisoned her sister in pursuance of a general plan or scheme, in which the poisoning of Mr. Freeman was a later step.

We are further of the opinion, that the preliminary evidence which was before the court was sufficient to warrant the introduction of evidence to show that the prisoner poisoned her sister, Mrs. Freeman. Certain facts were not in dispute. Prince Arthur Freeman, the person whom the prisoner was charged in the indictment with having poisoned, held a certificate of membership in a society which provided for the payment of $2,000 upon his death to the beneficiary named therein, with a power of substitution; his wife, who was the prisoner's sister, was named as beneficiary; she died on February 26, 1885, after an illness of about three weeks; the prisoner called at Freeman's house in South Boston on February 20th, and on February 23d went there to take care of Mrs. Freeman, and stayed till her death; immediately after Mrs. Freeman's death, Mr. Freeman, with his two children, went to live with the prisoner at her house in Cambridge; one of the children died in April; on or about May 13th, Mr. Freeman appointed the prisoner as beneficiary under the certificate of membership; he died on June 27th, after an illness of about six days, from arsenic; the prisoner, on September 23, 1885, received $2,000 from the society upon said certificate. Prior to 1885 the prisoner was owing several hundred dollars, which she was unable to pay, and for which she was hard pressed by her creditors, and which she paid out of the $2,000 so received by her.

As tending to prove the plan or scheme on her part to obtain this life insurance money through the murder of Mrs. Freeman, and then of Mr. Freeman, there was evidence to the effect that before Mrs. Freeman's death the prisoner knew of the certificate of membership insuring Mr. Freeman for his wife's benefit; that during Mrs. Freeman's illness the prisoner expressed the opinion that her sister would never recover, and said that she (the prisoner) had had a terrible dream, and whenever she had a dream like that one of the family always died; that before, as well as

after, Mrs. Freeman's death, the prisoner expressed the wish to have Mr. Freeman with his children come and live with her, and asked different persons to urge him to do so; that on the day of Mrs. Freeman's funeral the prisoner said that Mr. Freeman's sister, Mrs. Melvin, was very anxious to have him live with her, and that all Mrs. Melvin wanted was to get the insurance made over to her, but the prisoner said she herself had the best right to· it, and it was her sister's request that it should be made over to her, and she wanted it; that on the same day she talked with Mr. Freeman about the insurance, wanted to know if it was made over to her, and he said it was not, but should be; that quite frequently afterward she said she was afraid he would not make it over to her; that on June 22d, the same day when he was taken sick (which was after it had been made over to her), she sent to the society to see if the papers were right, in case anything happened to Mr. Freeman, and whether she would get the insurance, and to see that all assessments were paid up; that the appointment for the money to be payable to her was recorded in the books of the society not earlier than June 23d; that she also sent over to see about the insurance once or twice afterwards, before his death, and had an interview with the secretary of the society upon the same subject in Mr. Freeman's presence, the day before his death, and was told that the papers were all right, and afterwards, when not in his presence, requested the secretary not to tell Mr. Freeman's sister about the insurance. This evidence certainly tended to show a scheme and plan, entered into before Mrs. Freeman's death, to have the insurance money made payable to the prisoner.                *Exceptions overruled.*