Justices Bird and Haley do not concur.

---

ST. CROIX COMPANY *vs.* SEACOAST CANNING COMPANY.

Washington.   Opinion March 31 1916.

*Discretionary Rights of Presiding Justice.   Method of Proving Missing Contract or Writing.*

1.   When secondary evidence of the contents of a document is offered, its admissibility depends upon proof of the former existence of the document, and that it has been lost or destroyed or has become inaccessible, and as well upon proof that the requisite diligence has been used and efforts made to find it.   These preliminary questions of fact are all for the court.

2.   When secondary evidence of the contents of a document is offered, its former existence, if denied, must be proved to the satisfaction of the court.   But this rule means only that the court must be satisfied that there is sufficient evidence on the issue to go to the jury.

3.   When the issue is whether there is sufficient evidence of the former existence of a document, the contents of which it is sought to prove by secondary evidence, to what extent the court will hear evidence on the

preliminary question is discretionary. It may permit cross-examination. It may hear the evidence on both sides pertaining to this issue, or not, as it deems necessary or expedient.

4. A ruling to admit secondary evidence of the contents of a document involves necessarily a finding that the preliminary questions of facts have been sufficient to make the evidence admissible for the consideration of the jury. No special finding is necessary.

5. The court is of opinion that the verdict based as it necessarily must be upon a finding that the contract relied upon by the plaintiff existed and continued in force after May 6, 1907 is unmistakably wrong.

Action of assumpsit to recover price of certain goods sold and certain profits claimed to be due under an alleged contract. Plea, general issue. Verdict for plaintiff. Motion for new trial and exceptions filed. Motion for new trial sustained.

Case stated in opinion.

*Hinckley & Hinckley,* for plaintiff.

*R. J. McGarrigle, and Curran & Curran,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, KING, HALEY, PHILBROOK, JJ.

SAVAGE, C. J. In this action of assumpsit the plaintiff seeks to recover the price of goods sold, and profits, as per contract, on goods manufactured, and damages for breach of contract to manufacture other goods and divide the profits. The verdict was for the plaintiff, and the amount of the verdict shows that the jury awarded a substantial amount on each of the several classes of claims. The case comes before this court on defendant's exceptions and motion for a new trial.

The plaintiff bases its right to recover for the first two classes upon a written contract. The defendant denies that such a contract as claimed by the plaintiff ever existed. The first exception relates to the admissibility of oral testimony for the consideration of the jury of the existence and contents of the alleged contract. Such testimony was admitted. And the correctness of the ruling should be decided at the outset, because if the admission was wrong, the foundation for the larger part of the plaintiff's claim is swept away, and it will be unnecessary to examine the evidence on this branch of the case under the motion.

Both parties to this action were in 1907 canning companies, canners of fish. They both had been using plants in Robbinston. The precise relation of the plaintiff to the plant it had been using will be discussed later. The plaintiff's president and general manager, Mr. Holmes, was permitted, against objection, to testify in substance that during the last of March or first of April, 1907, he acting for the plaintiff, made a contract with the defendant, then represented by its vice president and general manager, Mr. McCall, that the contract was made at the defendant's office in Eastport, that it was reduced to writing by George A. Curran, Esq., who was at that time interested in the plaintiff's affairs, and was also general counsel in this State for the defendant, that the contract was in duplicate, that it was signed by himself for the plaintiff and by Mr. McCall for the defendant, and that Mr. McCall kept one copy and Mr. Curran the other. Mr. Holmes testified that he had never had nor seen the contract since, and that he had not been able to get a copy. It appeared that notice had been given to the defendant to produce the contract; likewise to Mr. Curran, who was attorney of record of the defendant. No such contract was produced, and counsel for the defendant told the court that no such contract ever existed. The issue then was not so much, and perhaps not at all, whether the plaintiff had taken the necessary steps to find and produce the contract, as it was whether such a contract had ever existed. After the evidence which we have summarized, the plaintiff offered the testimony of Mr. Holmes to show the contents of the contract. The evidence was admitted and the defendant excepted.

Mr. Holmes testified as follows: "It was an agreement entered into between the St. Croix Company and the Seacoast Canning Company, whereby the St. Croix Company was to sell what fittings and furnishings were in their factory, the manufactured and unmanufactured stock that was in that factory, for which the Seacoast Company was to pay market prices and invoice price for the fittings and furnishings; that these fittings and furnishings were to be taken to the plant of the Seacoast Canning Company that was to be refitted and operated during the season of 1907, that they were to pack 10,000 cases of the St. Croix Company's brands; that L. E. Holmes was to be superintendent and manager of the plant at a salary

of $1,000 per year, for doing the business; that the Seacoast Company was to finance the proposition and make the collections, and at the end of the season, they were to divide the portions of the net proceeds accruing from the packing of that amount of goods."

The defendant contends in argument that "before the contents of a lost instrument can be introduced in evidence, provided its existence is denied, sufficient evidence must be first produced to satisfy the presiding Justice that such an instrument did at one time exist," that in this case it "had a right to have the question of the existence or non-existence of the document passed upon by the court preliminary to the court's receiving secondary evidence of its contents."

The admissibility of a given piece of evidence is for the Judge to determine. When its admissibility in law depends on some incidental question of fact, this also is for the Judge to determine. 4 Wigmore on Ev, 3590. When secondary evidence of the contents of a document is offered, its admissibility depends upon proof of the former existence of the document, and that it has been lost or destroyed or has become inaccessible, and as well upon proof that the requisite diligence has been used and efforts made to find and produce the document. These preliminary questions are all for the court. Whether it is sufficiently shown that the document has been lost or destroyed, and whether proper efforts have been made to find and produce it, are questions addressed to the discretionary power of the court, and if there be no apparent abuse of his authority, his determination, as in all cases of discretionary authority, is final and conclusive. *Camden* v. *Belgrade*, 78 Maine, 204. This is a rule of practice in matters of evidence to be administered according to the discretion of the court. It is not concerned with the final determination of any fundamental issue of fact between the parties. It relates only to the manner of proof,—how, when, and under what conditions the issue may be proved.

It is also true that before secondary evidence of the contents of a document can be received, it must be proved to the satisfaction of the court that such a document once existed. But that does not mean that the court's preliminary determination is final and conclusive. It merely means that the court must be satisfied that there is sufficient evidence on the issue to go to the jury. To determine

whether an alleged contract which is the basis of a suit exists in fact might be, and often would be, to determine the only fundamental issue of fact in the suit; in other words, determine the suit. It would invade the constitutional province of the jury. To determine whether there is sufficient evidence of its existence to go to the jury is an exercise of discretion which is within the province of the court. In *State* v. *Robinson,* 146 Mass., 571, the court said: "A consideration of the nature of the question which is presented to the court when it is called upon to decide upon a preliminary question of fact, in order to determine whether offered evidence shall be received, will show that its determination reaches no further than merely to decide whether the evidence may or may not go to the jury. . . . It is only necessary that there should be so much evidence as to make it proper to submit the whole evidence to the jury." That was a criminal case, but the principle is the same in civil cases.

The court is to be satisfied that there is sufficient relevant evidence to go to the jury. To what extent the court will hear evidence on the preliminary question is discretionary. It may permit cross-examination. It may hear the evidence on both sides, or not. But in the end, in a case like this, it determines only whether the evidence of the existence of the document is sufficient to go to the jury. The final determination is for the jury. It is not necessary that the court make and announce its determination in so many words. A ruling to admit the secondary evidence involves necessarily a finding that the preliminary question of fact is sufficiently proved to make the evidence admissible. The defendant can take nothing by the exception.

To understand the merits of the case under the motion for a new trial it is necessary to state some preliminary history. Prior to 1905, the Robbinston Packing Company, in which Mr. Holmes and his family were interested, became insolvent, and assigned for the benefit of its creditors. Mr. Holmes likewise assigned. The International Trust Company, of which Mr. Curran was president, was a large creditor. Evidently with a view to protect the interests of the Trust Company, Mr. Curran became interested in the settlement of the estates under the assignments. In the end, a settle-

ment was reached under which the assignees conveyed the estates in their hands to Mr. Curran, and Mr. Curran on his part assumed certain obligations to the creditors. Thereupon the plaintiff corporation was organized in 1905 to carry on the canning business with the old plant of which Mr. Curran had the title. No property was conveyed to the plaintiff. Apparently it had no assets. The funds necessary to fulfil Mr. Curran's obligations to the creditors of the Robbinston Packing Company under the arrangement with the assignees were for the larger part, if not wholly, obtained from the Trust Company on notes of the plaintiff, endorsed by Mr. Curran. Mr. Curran appears to have been the only responsible party on the notes. The plaintiff operated the plant in 1905 and 1906, the latter year, nominally under a contract to operate it for Mr. Curran. From time to time Mr. Curran took bills of sale from the plaintiff to cover such property as the plaintiff had added to the plant and stock, in substitution for such property as the plaintiff had used or sold in its operations. So that in April 1907, Mr. Curran had the legal title to all the property in and about the plant. But Mr. Curran admits that the original conveyance to him was made to secure him for his liability on the obligations assumed by him on the notes or otherwise, and that the subsequent conveyances and contracts with the plaintiff were made for the purpose of securing him more completely. And he says that by virtue of the original arrangement between him and Mr. Holmes, if the property should be ultimately sold for more than enough to cover his, Curran's, obligations and advancements, if any, any balance remaining would equitably belong to Mr Holmes. And he denies that the plaintiff corporation, which was not in existence at the time he settled with the assignees and took title to the property, was in any way a party to this equitable agreement, and that it was not entitled to the benefits thereof. As to essentials thus far, there is litttle or no dispute. It was while matters were in the situation thus stated that the plaintiff claims that the contract was made, about which Mr. Holmes testified, and which is the basis for most of the plaintiff's claims embraced in this suit.

The defendant denies that any such contract was ever made. Mr. Holmes testifies that Mr. Curran and Mr. McCall were both present

when it was made, that Mr. Curran drafted it and Mr. McCall signed it.  Mr. Curran and Mr. McCall both testify that no such contract was ever made or signed.  On the contrary, they both say that on May 6, 1907, a contract in writing was executed between Mr. Curran, as owner of the factory at Robbinston, and the defendant by its vice-president, Mr. McCall, whereby it was agreed that the defendant should take possession of the Robbinston plant and supplies and use them in packing sardines during that season, that the defendant should pay Curran for shooks and supplies taken by it at the market rates, that the defendant should have the right to pack and sell goods under the brands used by the plaintiff, or otherwise as it saw fit, and that at the end of the season the profits of the season were to be divided equally between Curran and the defendant.

Such a contract as the one described was introduced in evidence. Though Mr. Curran and Mr. McCall both testify that Mr. Holmes was present when it was executed, Mr. Holmes denies it.  He says he never heard of this contract until the case came on for trial. But the defendant introduced in evidence a writing, admittedly signed by Mr. Holmes, for the plaintiff, in which the contract between Mr. Curran and the defendant is distinctly referred to, and in which "the St. Croix Company agrees that the brands heretofore packed by it may be packed under said contract [of Curran] with the Seacoast Canning Company and assents to all the conditions of said contract so far as the same in any way affects the St. Croix Company."  And it may be said here that except in the particular of the sale of the fittings, furnishings and stock manufactured and unmanufactured, which Mr. Holmes testified was embraced in the contract he signed, and of which some items were embraced in the Curran contract, the two contracts would work out essentially the same result.  For the profits of the Curran contract, under Mr. Curran's version of his understanding with Mr. Holmes, would in equity have belonged to Mr. Holmes, and Mr. Curran would have been accountable to him for them.  And except in name and legal entity, Mr. Holmes seems to have been the St. Croix Company.  Mr. Holmes attempts to explain how he came to sign the writing of assent, dated May 6, quoted above.  He says that paper "was given

simply as security to protect Mr. Curran on his endorsements."
But the explanation does not explain. Whatever the purpose may
have been, the point of this evidence is that it shows that Mr.
Holmes when he signed the writing, whether on May 6 or some
other time, had knowledge of the Curran contract, and assented to it.

Upon the whole evidence, the fact that Mr. Curran was the legal
owner of the property, the contract itself, the testimony of Mr.
McCall and Mr. Curran, supported and emphasized by Mr. Holmes'
written assent, we can entertain no doubt that the Curran contract
was made and executed on or about its date. To conclude other-
wise would be absolutely to disregard the effect of evidence, which
the court will not do, and the jury have no right to do.

As already shown the two alleged contracts embrace for the most
part the same subject matter, and as to matters embraced, they are
inconsistent. It could not have been intended that both should be
in force at the same time. Starting then with the premise which
we find established, that the Curran contract of May 6 was made
and signed by the parties to it, we are forced to take one of two
alternatives, either that there was no prior existing contract, or if
there was, that the Curran contract was intended to be substituted
for it. Either conclusion is fatal to the plaintiff's contention. It is
true that the Curran contract was afterwards repudiated by the
management of the Seacoast Canning Company, and was there-
upon cancelled by Mr. Curran. But that did not revive the prior
contract, if any such there was.

We have not overlooked the fact that in April, 1907, there were
various conferences and negotiations among the parties interested
looking to the taking over and the operation of the St. Croix plant
by the defendant, nor that Mr. Holmes testifies that prior to May
6 he had begun to move, or to prepare to move material and stock
from the St. Croix factory to the defendant's. It may well be that
the parties confidently expected that a satisfactory arrangement
would be made, and, in the interest of time, anticipated the execution
of the formal contract. The plaintiff claims that the conduct and
correspondence of the parties are strong confirmatory evidence of
the contract which Mr. Holmes says was made. But however that
may be, we must find that all prior understandings and negotiations

were merged in the contract of May 6. That this was so strong corroborative proof is found in that fact that Mr. Holmes, writing to Mr. Curran, October 24, 1908, and urging him to get a settlement with the Seacoast Company, and to collect what was due from it for goods for which it was accountable, and thus "get rid of an interest account that is slowly eating the property up," makes no mention of any claim for profits under his alleged contract.

Our conclusion then is that the jury were not warranted in finding that any contract was in existence after May 6, except the Curran contract. But for reasons already stated, that contract was never performed. It was abandoned. It follows that the basis of the plaintiff's claim for the price of goods sold and delivered, as under the alleged April contract, and for a share of the profits for the season of 1907 is shattered. And the case discloses no evidence to support the claim in the third and fourth counts of the writ, based on a subsequent contract by the defendant to can 10,000 additional cases of sardines.

But the defendant did receive several thousand dollars' worth of goods and stock from the St. Croix plant which it was bound to pay for to somebody. Since the April contract, if made, was no longer in force, we look further for the evidence of a sale. And we think it clearly appears that after the Curran contract was cancelled, the parties made new arrangements. The defendant purchased of Mr. Curran a large amount of material and stock, at prices agreed upon between them. And Mr. Holmes went to work for the defendant as foreman at $18 a week, instead of as superintendent at $1000 a year, as he says the original contract stipulated. Mr. Curran, holding the legal title, had the right to sell, and to agree upon a price, and his sale was valid as to the purchaser, without notice of any equitable infirmity in his title. Besides Mr. Holmes testifies that Mr. Curran was acting for the plaintiff in all this matter. So that whether he sold as owner, or sold as agent, his acts were valid as to third parties, in the absence of any proof of fraud. If Mr. Curran exceeded his authority, the plaintiff must look to him. It appears that the defendant paid Mr. Curran the agreed price, and that Mr. Curran applied it in reduction of the obligations he was under as endorser for the plaintiff. Later the

balance of the obligations of Mr. Curran was paid by Mr. Holmes, or for him, and Mr. Curran released the property he had held as security. In January, 1909, a full settlement was had between Mr. Curran and Mr. Holmes. Finally, in May, 1912, five years after the original transaction, and nearly five years after any possible breaches of any contract, this suit was brought.

The jury found for the plaintiff for every one of its claims, proved or unproved. We think the verdict was unmistakably wrong. Whether it was due to misunderstanding of the facts, or of the law, or due to prejudice, we have no occasion to inquire.

It is unnecessary to consider the remaining exceptions.

*Motion for a new trial sustained.*