## Commonwealth *vs.* Ahmad Bright.

Middlesex. May 10, 2012. - September 13, 2012.

Present: Ireland, C.J., Spina, Cordy, Gants, Duffly, & Lenk, JJ.

*Homicide. Armed Assault with Intent to Murder. Firearms. Joint Enterprise.*
*Evidence,* Joint venturer, Hearsay, Third-party culprit. *Practice, Criminal,*
Hearsay, Instructions to jury, New trial, Jury and jurors, Deliberation of
jury, Indictment, Lesser included offense. *Assault by Means of a Danger-*
*ous Weapon. Jury and Jurors.*

At a murder trial at which the judge admitted in evidence testimony from one
witness that contained many hearsay statements made by the defendant's
alleged coventurers, the judge properly instructed the jury, at the time the
evidence was admitted and again in the final charge, that they could consider
those statements against the defendant only upon finding by a preponder-
ance of the evidence that the statements were made in furtherance of a
continuing joint venture between the defendant and each of the declarants
[426-434]; further, sufficient evidence existed, apart from the statements in
question, from which the judge and jury could have determined that it was
more likely than not that those statements were made in furtherance of a
continuing common undertaking [434-437].
At a murder trial, the judge did not err in prohibiting testimony concerning
the alleged gang affiliations of a number of individuals involved in the
case, where the relevance of such testimony as third-party culprit evidence
was minimal, in that it did not point to any particular third party who
might have committed the crime; and where the testimony did not constitute
evidence of police failure to investigate alternate suspects. [437-441]
A Superior Court judge did not err in denying the criminal defendant's motion
for a new trial, in which the defendant argued that the jury considered
extraneous and prejudicial information in the course of their deliberations,
where the judge's questioning of two jurors did not suggest that any juror
had been exposed to extraneous factual material but, rather, showed that a
third juror was expressing his subjective opinion of the defendant's character
and propensity to criminality. [441-445]
This court remanded a conviction of assault by means of a dangerous weapon
for entry of a judgment of conviction of simple assault, where the indictment
stated a charge of armed assault with intent to murder, and assault by means
of a dangerous weapon is not a lesser included offense of armed assault with
intent to murder. [445-446]

Indictments found and returned in the Superior Court Depart-
ment on August 14, 2006.

The cases were tried before *Thomas P. Billings*, J., and a motion for a new trial was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Paul F. Ware, Jr. (Nicholas K. Mitrokostas & Yvonne W. Chan* with him) for the defendant.

*Michael A. Kaneb*, Assistant District Attorney (*John C. Verner*, Assistant District Attorney, with him) for the Commonwealth.

*Alex G. Philipson & Peter B. Krupp*, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

*Peter M. Onek*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

LENK, J. The defendant, Ahmad Bright, was indicted on charges of murder in the first degree, armed assault with intent to murder, and unlawful possession of two firearms. The charges arose out of the then sixteen year old defendant's asserted participation in what the trial judge described, in denying the defendant's motion for a new trial, as an "alleged contract killing by one drug dealer of another." A jury convicted the defendant of murder in the second degree, assault by means of a dangerous weapon, and unlawful possession of one firearm. The defendant appealed from his convictions and the denial of his motion for a new trial. We allowed his application for direct appellate review.[1]

The jury heard evidence that the victim, Corey Davis, was shot for a fee in Cambridge on the night of March 18, 2006, by one Remel Ahart, who acted at the behest of the defendant's older brother, Sherrod Bright.[2] The defendant, who was armed, accompanied Ahart to the scene of the crime. The defense suggested several alternate theories of the crime; prominent among them was the argument that James Miller, the Commonwealth's key witness, and not the defendant, had participated with Ahart in the shooting. There was evidence that the victim, Ahart, and Sherrod were involved in the drug trade, and that Miller, too,

---

[1] We acknowledge the amicus briefs of the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers.

[2] Because Sherrod Bright, the defendant's older brother, shares a surname with the defendant, we refer to Sherrod by his first name.

was considering dealing drugs. The defendant was a college-bound varsity athlete in his junior year of high school.

On appeal, the defendant claims error in multiple respects. He maintains that the judge erred both in allowing the admission of certain out-of-court declarations made by Ahart and Sherrod, and in instructing the jury on the use of these conventurer declarations. He claims error as well in the restrictions placed on his ability to elicit testimony as to the gang affiliations of potential third-party culprits, and in the judge's posttrial rulings on his motion for a new trial. Each of these claims is unavailing, and we affirm the defendant's convictions of murder in the second degree and unlawful possession of a firearm.

However, the defendant was not indicted on the charge of assault by means of a dangerous weapon, of which he was ultimately convicted. That charge is not a lesser included offense of armed assault with intent to murder, the charge on which he was indicted. Accordingly, the defendant's conviction of assault with a dangerous weapon is vacated, and the case is remanded for entry of a judgment of simple assault.

1. *Background.* We recite the facts as presented by the Commonwealth's witnesses at trial.

Shortly before midnight on March 18, 2006, Corey Davis was shot multiple times while seated in the passenger seat of his vehicle, which was stopped on Hamilton Street in Cambridge. Ahart, the shooter, continued firing his nine millimeter pistol as the victim stumbled out of the vehicle and attempted to flee. The victim died from his wounds.

Corey Davis's cousin, Troy,[3] was in the driver's seat of Corey's automobile. As Troy opened the door to run, he saw a person of the defendant's stature and build aiming a revolver at him in "[f]iring stance."[4] Because the individual was wearing a hooded sweatshirt, Troy did not observe the individual's facial features and was unable to say whether the defendant was the person he saw.

---

[3]Because Troy Davis, the victim's cousin, shares a surname with the victim, we refer to Troy by his first name.

[4]The revolver, although operable, was not discharged during the incident. Marks on the ammunition recovered with the revolver suggested that an attempt had been made to fire the bullets, either during the incident or at some time previous, but that the bullets were faulty.

Indeed, just one witness squarely placed the defendant at the scene of the crime. Miller, a previously incarcerated aspiring drug dealer, stated that the defendant and Ahart had picked him up that evening from his residence in Cambridge. The three spent much of the night driving around Cambridge and Boston, looking for beer and cigars. Early in the evening, Miller saw Ahart with a revolver. A few hours later, the defendant received a telephone call, after which the defendant said to Ahart, "Yo, niggers got a Baby 9 for us." The defendant then drove Ahart and Miller to the defendant's home in the Dorchester section of Boston, where they met Sherrod and another man, retrieving a nine millimeter pistol.

The defendant, Ahart, and Miller then drove back to Cambridge. On the way, and while driving around Cambridge, Ahart and the defendant[5] told Miller that they had come to believe that the victim had stolen $15,000 from Sherrod.[6] Miller also was told that Sherrod had asked Ahart and the defendant to kill the victim in retribution, offering to pay them "a couple thousand" dollars on completion of the deed. Having explained this background, Ahart and the defendant attempted to persuade Miller to tell the victim, an acquaintance of Miller, to meet them. They also attempted to have Miller procure a third weapon from a friend. Although Miller contacted this friend, he was told that the weapon had already been sold.

Late in the evening, Ahart, Miller, and the defendant spotted the victim's vehicle passing by a rotary. The defendant followed the victim in his Jeep Grand Cherokee, observing the victim park on Hamilton Street. Stopping on an adjacent road, the defendant exclaimed, "[L]et's kill that man." He got out of the vehicle and ran with Ahart back toward Hamilton Street and out of Miller's field of vision. Ahart carried the pistol, while the defendant took the revolver. At that point, Miller left the vehicle and began walking away from the scene. Minutes later, however,

---

[5] It is difficult to discern from James Miller's testimony which of the statements he reported from those conversations were made by Remel Ahart and which were made by the defendant.

[6] Miller testified that Sherrod and Ahart were involved together in selling drugs. At the time of his death, the victim had on his person cocaine packaged in a manner described by a police witness as consistent with "street-level distribution."

he encountered Ahart and the defendant, who persuaded him to get back into the Jeep. Miller asked them, "Yo, you dudes just did that shit?" They replied, "Yeah."

Records from a cellular telephone closely associated with the defendant were consistent with Miller's account of the defendant's movements. The records suggested that, for most of the night, Miller's cellular telephone was moving in tandem with the defendant's telephone. The weapons described by Miller were recovered near the scene of the crime.[7]

Miller testified also to two meetings he had with Ahart in the days following the shooting; the defendant was not present at either meeting. At the first meeting, Ahart and Miller discussed that the police had already spoken to at least one of their acquaintances about the shooting, and that they were looking for Ahart in connection with the crime. Ahart urged Miller to "lay low" and offered to buy Miller clothes in exchange for his silence. Ahart also provided additional details of what had occurred in the minutes after the defendant and Ahart had left the Jeep, saying that he had shot the victim but that the defendant had "froze[n] up," allowing Troy to escape. Ahart suggested that Miller might help them "get" Troy. At the second meeting, at which Sherrod was also present, the three discussed an alibi for the night of the murder, one which included Miller. Miller was again warned, "[D]on't say nothing."

2. *Discussion.* As previously stated, the defendant contends that the judge erred in three respects at trial: in permitting the admission, through Miller, of certain of Ahart's and Sherrod's out-of-court statements; in instructing the jury on the circumstances in which they could consider such statements; and in precluding defense counsel from pursuing lines of questioning that could have shown that the murder was the result of a dispute between gangs. He also claims error in the denial of his motion

_____

[7]One of the defendant's theories of the case, developed through an extended cross-examination, was that Miller, rather than being an unwitting observer to the night's events, was party to Sherrod's plan and had implicated the defendant solely to avoid his own prosecution. The defendant emphasized Miller's criminal history and his admitted desire to deal drugs for Sherrod, drawing a contrast with the defendant's own background and aspirations. A ranked varsity tennis player, the defendant attended Buckingham Browne & Nichols and was contemplating attending college in Georgia.

for a new trial, arguing that the jury considered extraneous and prejudicial information in the course of their deliberations. Finally, he maintains that his conviction of assault by means of a dangerous weapon was obtained in violation of his right not to be convicted of a crime without first having been indicted for that offense. We address each of these claims in turn.

a. *Joint venture hearsay.* Miller's testimony contained many hearsay statements. The vast majority of these statements were attributed to Ahart, and a small number to Sherrod.[8]

We recognize an exception to the hearsay rule whereby "statements by joint venturers are admissible against each other if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Braley*, 449 Mass. 316, 319 (2007), quoting *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990). See *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987). This rule derives from an analogy between a criminal venture and a lawful partnership: each venturer is treated as an "agent for the other in all matters relating to the common object, and the acts and declarations of one in furtherance of such object are admissible to affect the principal as well as the agent." *Commonwealth* v. *Tivnon*, 8 Gray 375, 381 (1857). Accord *Commonwealth* v. *White*, 370 Mass. 703, 712 (1976).

A trial judge may allow the admission of such statements, but only after a preliminary determination, based on a preponderance of admissible evidence other than the out-of-court statements themselves, that a criminal joint venture existed between the declarant and the defendant, and that the statement was made in furtherance of the venture.[9] *Commonwealth* v. *Cruz*, 430 Mass. 838, 844 (2000). Such a preliminary determination permits a coventurer's out-of-court statements to come before a

---

[8]Miller testified also to out-of-court statements made by the defendant himself. As admissions of a party opponent, such statements are not considered hearsay. See *Commonwealth* v. *Marshall*, 434 Mass. 358, 365-366 (2001), and cases cited.

[9]Out-of-court statements may generally be admitted provisionally, subject to a motion to strike should the evidence presented through the course of the Commonwealth's case fail to establish the existence of a joint venture. *Commonwealth* v. *Collado*, 426 Mass. 675, 681-682 (1998), citing *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543-544 (1990).

jury but does not suffice to permit the jury to consider the statements as bearing on the defendant's guilt. Rather, the jury must first make their own independent determination, again based on admissible evidence other than the statements themselves, on "the same questions" that the judge must pass on. *Commonwealth v. Borans,* 379 Mass. 117, 145 n.26 (1979), quoting *Commonwealth v. Beckett,* 373 Mass. 329, 337 n.3 (1977).

Here, the defendant claims that the judge erred both in allowing certain of Ahart's and Sherrod's out-of-court statements to be admitted, and in instructing the jury as to their use. We consider first the defendant's claim that the judge erred in instructing the jury that the challenged statements could be considered if the jury found a "fair inference" of such a common undertaking. The defendant maintains that the jury were instead required to make the requisite preliminary findings on proof beyond a reasonable doubt. Second, we address the defendant's contention that there was insufficient evidence that the admitted statements were made in furtherance of a continuing common undertaking even under a preponderance standard, such that the statements should have been excluded entirely. We discern no error.

i. *Jury instruction.* Whether Ahart's and Sherrod's out-of-court statements were made during the pendency of a joint venture with the defendant, and in furtherance of that venture, is a question of "foundational, preliminary, or predicate fact[]." 1 McCormick on Evidence § 53, at 268 (K.S. Broun ed. 2006). See *Bourjaily v. United States,* 483 U.S. 171, 179 (1987); Mass. G. Evid. § 104(a) & note, at 10-11 (2012). As a general principle, both in Massachusetts and across the United States, "[f]oundational facts conditioning the application of technical exclusionary rules," including the hearsay rule, are reserved to the judge; conversely, "[f]oundational facts conditioning the logical relevance of the evidence"[10] are submitted to the jury, at least where there is sufficient evidence to support a jury determin-

---

[10]An example of such a foundational fact conditioning the logical relevance of other evidence is where testimony that a particular shoe print was found at the scene of a crime may be relevant only on the condition that the jury find that the defendant owned a matching pair of shoes. See, e.g., *Commonwealth v. Gambora,* 457 Mass. 715, 730 (2010).

ation that the condition has been fulfilled. 1 McCormick on Evidence, supra at § 53, at 269, 271. See Fed. R. Evid. 104(a)-(b) (2011); Mass. G. Evid. § 104(a), (b). Under this principle and, indeed, under the Federal Rules of Evidence, the question whether an out-of-court statement satisfies an exception to the hearsay rule is one for the judge alone. See *Bourjaily* v. *United States, supra* at 177-178, quoting Fed. R. Evid. 104(a).

The distinction between preliminary facts bearing on the application of exclusionary rules, which are found by the judge, and preliminary facts bearing on conditional or logical relevance, which are reserved to the jury, has its origin in the theory of preliminary evidence developed almost a century ago by Professor Edmund M. Morgan, Reporter of the American Law Institute's Model Code of Evidence, whose work was relied on extensively in formulating the Federal Rules of Evidence, and certain of his contemporaries. See Pattenden, Pre-Verdict Judicial Fact-Finding in Criminal Trials with Juries, 29 Oxford J. Legal Stud. 1, 24 & n.216 (2009), citing Morgan, Functions of Judge and Jury in the Determination of Preliminary Questions of Fact, 43 Harv. L. Rev. 165, 170 (1929). As explained in an article relied on by Morgan, questions of conditional relevance require "[n]o complex [jury] instructions" and "merge[] imperceptibly into the weight of the evidence." Maguire, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv. L. Rev. 392, 398 (1927), quoting *Di Carlo* v. *United States*, 6 F.2d 364, 367 (2d Cir.), cert. denied, 268 U.S. 706 (1925). A jury would naturally disregard evidence they found not to be relevant to the case based on their determination of a predicate fact.[11] Conversely, the application of technical exclusionary rules could confuse the jury, and it would likely be difficult for a jury to ignore testimony directly bearing on a defendant's guilt on the basis of what might appear a mere technicality. See Morgan, *supra* at 168-169.

Although our cases reflect similar concerns, unlike Morgan, and unlike the Federal courts, we preserve an independent role for the jury in applying select technical exclusionary rules: those governing admissions and confessions, *Commonwealth* v.

---

[11]Following the example from note 10, *supra*, the jury are unlikely to be prejudiced by knowledge of a shoe print at the scene of a crime if they simply did not believe that the defendant owned a matching shoe.

*Tavares*, 385 Mass. 140, 152-153, cert. denied, 457 U.S. 1137 (1982) (humane practice); dying declarations, *Commonwealth* v. *Polian*, 288 Mass. 494, 498 (1934); and out-of-court statements of coventurers,[12] *Commonwealth* v. *Beckett, supra* at 340. In each case, "the judge hears the [preliminary] evidence, himself resolves evidentiary conflicts and gives his own answer to the" preliminary question. *Jackson* v. *Denno*, 378 U.S. 368, 378 n.8 (1964) (discussing "Massachusetts procedure"). The jury "may then . . . disagree with the judge," decline to find the preliminary facts, and ignore the proffered evidence. *Id.*

As a matter of practice, the jury's role in enforcing each of these exclusionary rules is well established. See, e.g., *Commonwealth* v. *Culver*, 126 Mass. 464, 466 (1879) ("it is not an uncommon practice . . . for the presiding judge to allow . . . all the evidence bearing upon the manner in which [confessions] were obtained, to be submitted to the jury"). Indeed, with particular respect to the last of these rules, the coventurer hearsay exception, our decisions suggest a long-standing custom in the trial courts of instructing a jury to consider independently the question "whether [coventurers] did confederate in a common design." See *Commonwealth* v. *Brown*, 14 Gray 419, 432 (1860). But while such instructions were commonly given, it was not until 1977 that we expressly held them to be a necessary condition of admissibility, rather than merely reflecting a salutary or recommended practice.[13] See *Commonwealth* v. *Beckett, supra* ("Although the issue does not appear to have

---

[12]Our cases have not discussed at any length the rationale for preserving an independent role for the jury with respect to some, but not all, hearsay exceptions. We note that the factual determinations relevant to both dying declarations and coventurers' statements are uniquely subjective. The dying declaration exception requires an inference as to the declarant's state of mind: whether he or she spoke under a genuine apprehension of "swift and certain doom." *Shepard* v. *United States*, 290 U.S. 96, 100 (1933). The coventurer exception, too, turns in part on the state of mind of the declarant and the defendant: whether the independent evidence suggests that each possessed the bona fide intent to cooperate together in a common criminal enterprise. See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 466-467 (2009).

We note also that G. L. c. 233, § 78, requires that when a business "record is admitted in a criminal proceeding all questions of fact which must be determined by the court as the basis for the admissibility of the evidence involved shall be submitted to the jury."

[13]The defendant views two Nineteenth Century cases, *Commonwealth* v.

been presented to this court previously, we think it is clear that the jury must be [so] instructed").

In establishing the requirement that the jury make an independent determination of the existence of a common undertaking, the court in *Commonwealth* v. *Beckett*, *supra*, cited a case where we had noted the trial judge's provision of such a charge, and another where we had considered the sufficiency of the evidence of a common undertaking that was before the jury. See *id.*, citing *Commonwealth* v. *Dahlstrom*, 345 Mass. 130, 134 (1962); *Commonwealth* v. *Mannos*, 311 Mass. 94, 106 (1942). But these cases reflected only that the jury were required to make an independent determination on the existence of a common undertaking, and did not address the proper standard of proof. See *Commonwealth* v. *Rogers*, 181 Mass. 184, 193 (1902) (noting only that jury were "cautioned to use their own judgment"); *Commonwealth* v. *Brown*, *supra* ("the question whether they did confederate in a common design . . . [was] left to the determination of the jury").

---

*Brown*, 14 Gray 419, 432 (1860), and *Commonwealth* v. *Robinson*, 146 Mass. 571, 582-583 (1888), as establishing as early as 1860 the requirement that the jury determine independently the existence of a joint venture. His reading of these cases is in error.

The view of a prominent mid-century treatise, cited in both *Commonwealth* v. *Brown*, *supra*, and *Commonwealth* v. *Robinson*, *supra*, was that questions of preliminary fact were primarily for the judge, though he could, "*at his discretion*, take the opinion of the Jury upon them" (emphasis added). 1 S. Greenleaf, Evidence § 49, at 65-66 (7th ed. 1854). See *id.* at § 111, at 141 (requiring, prior to admission of coconspirator's declarations, "proof, sufficient in the opinion of the Judge, to establish prima facie, the fact of conspiracy between the parties, *or* proper to be laid before the Jury, as tending to establish such fact" [emphasis added]).

*Commonwealth* v. *Robinson*, *supra* at 582, in particular, establishes merely that the "weight and credit" of the out-of-court statement as bearing on the ultimate question of the defendant's guilt is left to the jury. Indeed, that case cited approvingly a case which held, in reference to the statements of coventurers, that "the question of the admissibility of the declarations is to be determined by the Court." *Commonwealth* v. *Crowninshield*, 10 Pick. 497, (1830).

The defendant ignores that, as late as 1972, we approved the instructions of a judge who simply "told the jury that . . . any testimony by [a codefendant] which had been limited to the particular defendant about whom he was testifying at the time was now being admitted as to all three defendants," without any discussion of the jury's duty to make an independent determination on the proper use of that codefendant's statements. *Commonwealth* v. *Flynn*, 362 Mass. 455, 476 (1972).

Nor has the standard of proof to be employed by the jury been settled by any of our subsequent cases involving the out-of-court statements of coventurers, even where those cases have in passing employed one or another turn of phrase. Rather, while certain of our cases have approved of jury instructions employing a "reasonable doubt" standard,[14] see *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994), others have suggested that the jury may rely upon a mere "fair preponderance," *Commonwealth* v. *Caldwell*, 459 Mass. 271, 287 (2011), "fair inference," *Commonwealth* v. *Benesch*, 290 Mass. 125, 133 (1935), or "adequate probability," *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983), quoting *Commonwealth* v. *White*, 370 Mass. 703, 709 n.7 (1976), of the existence of a common undertaking. In none of these cases has the question of the standard of proof been essential to the decision, or a subject of contention between the parties.

Not having been presented squarely with the question of the standard of proof the jury must employ, and therefore lacking the benefit of clear guidance from prior cases, we turn instead to an axiomatic "fact[] of evidentiary life": determinations of preliminary factual questions relating to the admission of evidence are "traditionally . . . established by a preponderance of proof," even where the case as a whole must ultimately be proved beyond a reasonable doubt. *Bourjaily* v. *United States*, 483 U.S. 171, 175, 179 (1987). See *Lego* v. *Twomey*, 404 U.S. 477, 488 (1972); Mass. G. Evid. § 104(a) & note (2012).

---

[14]Prior to 2000, the only cases referencing such a standard were *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994), and *Commonwealth* v. *Bart B.*, 424 Mass. 911, 915 n.6 (1997), both in the course of noting that a "beyond a reasonable doubt" instruction had been given by the trial judge. But as we said in *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 249 n.7 (2000), the case cited in *Commonwealth* v. *Clarke, supra*, to support the correctness of the instruction given does not actually support a "beyond a reasonable doubt" standard. See *Commonwealth* v. *McLaughlin, supra*, citing *Commonwealth* v. *Borans*, 379 Mass. 117, 145 n.26 (1979) (noting that *Commonwealth* v. *Borans, supra*, quotes *Commonwealth* v. *Beckett, supra*, that "the jury 'must make definite findings on the same questions which the judge must pass on' ").

*Commonwealth* v. *Clarke, supra*, was subsequently relied on without comment in *Commonwealth* v. *Raposa*, 440 Mass. 684, 690 n.7 (2004) (noting in passing that such instruction was given), and the "reasonable doubt" standard was mentioned briefly in dicta in *Commonwealth* v. *Braley*, 449 Mass. 316, 322 (2007).

We have applied the preponderance standard as the prevailing general rule both in cases involving the determination of a preliminary question by the judge alone, see generally *id.* at 11, and in cases involving the independent determination of a preliminary question by both judge and jury. As we said in *Commonwealth* v. *Polian*, 288 Mass. 494, 499 (1934), where a jury must determine whether an asserted dying declaration was made under the apprehension of "swift and certain doom," *Shepard* v. *United States*, 290 U.S. 96, 100 (1933), "the better view is that . . . it is enough" that they find "by a preponderance of the evidence the necessary preliminary facts." *Commonwealth* v. *Polian, supra.* See *Commonwealth* v. *Green*, 420 Mass. 771, 781-782 (1995).

As the *Polian* decision illustrates, although the admission of out-of-court declarations implicates the defendant's constitutional right to confront the witnesses against him, that fact does not itself change the standard to be applied by either judge or jury. See *Commonwealth* v. *Carr*, 458 Mass. 295, 299 (2010) (judge found that Commonwealth had not established that defendants gave consent to search by preponderance of evidence); *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989) (judicial finding of inevitable discovery by preponderance of evidence).

The defendant emphasizes, however, that we require the voluntariness of a confession be shown beyond a reasonable doubt. *Commonwealth* v. *Tavares*, 385 Mass. 140, 152-153, cert. denied, 457 U.S. 1137 (1982). That heightened standard applies equally to judge and jury, as does the preponderance standard used in the admission of dying declarations. In contrast, the rule proposed by the defendant would result in the judge and jury each applying a different standard in determining whether to admit the out-of-court statements of coventurers.[15] Cf. *Commonwealth* v. *Cruz*, 430 Mass. 838, 844 (2000) (judge makes preliminary

[15]The defendant's proposed rule would be incongruous in another respect. "It is difficult to see what value the declarations could have as proof" of a joint venture if before using them the jury had already to be satisfied beyond a reasonable doubt that the declarant and the defendant were joined in a common undertaking to commit a crime. See *United States* v. *Dennis*, 183 F.2d 201, 231 (2d Cir. 1950), aff'd, 341 U.S. 494 (1951) (discussing identical rule applied in conspiracy prosecutions). See also *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 249 n.7 (2000). Frequently in joint venture prosecutions,

determination of existence of joint venture by preponderance of evidence).

Further, the strength of the humane practice rule responds to two specific concerns not present here. The first of these concerns is that an admission to criminal activity made to a law enforcement official "is usually 'the key item in the proof of guilt, and certainly one of overpowering weight with the jury,' " *Commonwealth* v. *Tavares*, *supra* at 152, quoting *Clifton* v. *United States*, 371 F.2d 354, 362 (D.C. Cir. 1966) (Leventhal, J., concurring), cert. denied, 386 U.S. 995 (1967), notwithstanding the many tactics and factors that may serve subtly to compromise the reliability of a confession. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 440-441 (2004). By contrast, a coventurer's declaration is unlikely to have been elicited by trained interrogators wielding the authority of the State. Moreover, a coventurer's statement in furtherance of a conspiracy does not reflect the defendant's own words and is not a direct admission of culpability to a hostile party.[16] Accordingly, there is less reason to think that such statements will routinely be treated by the jury as overpowering or practically irrefutable evidence of guilt.[17]

The second consideration behind the strength of the humane

including this case, there is no question that the crime was committed by some person; the sole contested issue is whether the defendant participated in its commission. Under the defendant's proposed rule, the jury would only be able to consider the coconspirator's statements after determining beyond a reasonable doubt that the defendant had participated in the crime and was therefore part of the joint venture. Yet, at that point, the statements would be entirely superfluous: the jury would already have concluded that the defendant was guilty beyond a reasonable doubt.

[16]A coconspirator's statement must be made "in furtherance of [the] goal" of the conspiracy. Mass. G. Evid. § 801(d)(2)(E) (2012). Accordingly, our cases make clear that "[c]onfessions or admissions of conspirators or joint venturers" to strangers or third parties unsympathetic to the goals of the venture "are not admissible . . . as vicarious statements of the other members of the conspiracy or joint venture." *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 n.11 (1983). Contrast note 17, *infra*.

[17]Other States require that the voluntariness of a confession be proved to the judge beyond a reasonable doubt, see, e.g., *Shepler* v. *State*, 274 Ind. 331, 334 (1980); *State* v. *Nadeau*, 1 A.3d 445, 465 (Me. 2010); *People* v. *Witherspoon*, 66 N.Y.2d 973, 974 (1985); *State ex rel. Goodchild* v. *Burke*, 27 Wis. 2d 244, 265 (1965), cert. denied, 384 U.S. 1017 (1966), but permit proof of facts preliminary to the admission of coventurers' statements by a lesser

practice instruction is that art. 12 of the Massachusetts Declaration of Rights provides uniquely expansive protection against self-incrimination.[18] See *Commonwealth* v. *Clarke,* 461 Mass. 336, 346 & n.8 (2012). Again, the contrast is clear: we have held, with respect to the constitutional dimensions of the hearsay rule, that "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment to the United States Constitution." *Commonwealth* v. *Zeininger,* 459 Mass. 775, 785 n.15, cert. denied, 132 S. Ct. 462 (2011), quoting *Commonwealth* v. *DeOliveira,* 447 Mass. 56, 57 n.1 (2006).

In sum, confessions are exceptional. The standard used in our humane practice instruction does not provide adequate cause to depart in this case from the general rule that preliminary questions of fact relative to the use of evidence are decided by a preponderance of the evidence. The judge properly instructed the jury, at the time the evidence was admitted and again in his final charge, to consider Ahart's and Sherrod's out-of-court statements only upon finding by a preponderance of the evidence that they were made in furtherance of a continuing joint venture between the defendant and each of the declarants.[19]

ii. *Admission in evidence.* We now turn to the question whether there was sufficient evidence, apart from Ahart's and Sherrod's out-of-court statements, from which the judge and jury could

standard. See, e.g., *Wright* v. *State,* 690 N.E.2d 1098, 1105 (Ind. 1997) (preponderance); *State* v. *Quimby,* 589 A.2d 28, 30 (Me. 1991) (preponderance); *People* v. *Bac Tran,* 80 N.Y.2d 170, 175 (1992) ("prima facie case"); *State* v. *Dorcey,* 103 Wis. 2d 152, 157 (1981) ("prima facie showing").

[18]Our decision in *Commonwealth* v. *Tavares,* 385 Mass. 140, 149-150 & n.15, cert. denied, 457 U.S. 1137 (1982), rested on common-law grounds. As observed by a former Chief Justice of this court, "Significant rights of a criminal defendant in this Commonwealth are often established by a common law rule . . . ." Wilkins, The State Constitution Matters, 44 Boston B.J. 4, 14 (2000), citing *Commonwealth* v. *Tavares, supra.*

[19]The defendant does not contest that the judge's instructions, which described the standard to be employed as requiring a "fair inference," adequately reflected a preponderance standard. It is preferable for a judge to instruct that the jury find the existence of a venture "more likely than not." Cf. Young, Pollets, & Poreda, Evidence § 102.12 (1998) (quoting multiple model instructions, each using phrase "more likely than not" or variant thereof). Nevertheless, the use of the phrase "fair inference" would not have communicated to the jury that they could consider the statement even if they thought it more likely than not that a common undertaking did not exist.

have determined it was more likely than not that those state-
ments were made in furtherance of a continuing common under-
taking.

On appeal, we view the evidence presented to support the
existence of a joint venture "in the light most favorable to the
Commonwealth," recognizing also that the venture "may be
proved by circumstantial evidence." *Commonwealth* v. *Braley*,
447 Mass. 316, 320 (2007), and cases cited. A joint venture is
established by proof that two or more individuals "knowingly
participated in the commission of the crime charged . . . with
the intent required for that offense." *Commonwealth* v. *Zanetti*,
454 Mass. 449, 466 (2009). Participation may take the form of
an agreement to be available to assist in the commission of the
crime. Such an agreement need not "be made through a formal
or explicit written or oral advance plan or agreement; it is
enough consciously to act together before or during the crime
with the intent of making the crime succeed." *Id*. at 470
(Appendix).

There is ample evidence, apart from the out-of-court state-
ments themselves, to support an "adequate probability of the
existence of a common venture," *Commonwealth* v. *Braley*, *su-
pra*, quoting *Commonwealth* v. *Bongarzone*, 390 Mass. 326,
340 (1983), between and among Ahart, Sherrod, and the defend-
ant. Miller testified that he, Ahart, and the defendant drove
together from Cambridge to the Dorchester section of Boston,
retrieved a pistol from Sherrod,[20] drove back to Cambridge,
and, both carrying firearms, ran in tandem toward the scene of a
shooting, returning minutes later. Further, statements Miller at-
tributed to the defendant suggest that the defendant believed the
victim to have stolen a substantial sum of money from Sherrod,
and that the defendant and Ahart left their Jeep intending, in the
defendant's words, to "kill that man." These statements, while
introduced through Miller, qualify as statements of a party op-
ponent and are not hearsay. See *Commonwealth* v. *Mendes*, 441
Mass. 459, 467 (2004); Mass. G. Evid. § 801(d)(2)(A) (2012).

The defendant's argument, however, focuses primarily on
statements made after the crime had been committed, in the

[20]Sherrod was a major contributor to deoxyribonucleic acid (DNA) found
on that weapon.

course of two meetings between Miller and Ahart following the shooting. Sherrod attended the second of these meetings, but the defendant was not present at either one.

Miller's testimony reflected that both meetings centered upon attempts "to encourage [Miller] not to disclose facts" related to the murder, and to procure his assistance in actively concealing the crime. *Commonwealth* v. *Beckett*, 373 Mass. 329, 340 (1977). At the first of their two meetings, Ahart explained to Miller that the defendant had not shot Troy, a percipient witness to the killing. Taking Miller's testimony in the light most favorable to the Commonwealth, Ahart then suggested to Miller the need to kill Troy in order to silence him. At the second meeting Ahart, Miller, and Sherrod discussed an alibi. Because the meetings were attempts "to conceal the crime in furtherance of the joint venture,"[21] statements made in their course were properly admissible against any member of the joint venture. *Commonwealth* v. *Braley, supra* at 330.

The defendant contends that absent his direct participation in the meetings, there was no independent evidence that he took part in what he characterizes as a separate joint venture to conceal the crime. This argument misconceives our cases, which regard both the commission of the crime and the attempt to evade arrest for the crime as part of a single, continuous joint venture. See *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993) ("Efforts on the part of a joint venturer to conceal the occurrence of the enterprise's unlawful purpose or to effect an

---

[21]We have expressed skepticism that disclosure of the circumstances of the crime to a third party can be considered as furthering an effort to conceal the very crime disclosed. *Commonwealth* v. *Santos, ante* 273, 290-292 (2012); *Commonwealth* v. *Stewart*, 454 Mass. 527, 537 (2009). Here, however, there was independent evidence that Miller had observed much of the preparation for the crime, that he was broadly familiar with the planned venture, and that he had cooperated — or, on his account, feigned cooperation — in it, attempting to procure an additional murder weapon. Ahart, Sherrod, and the defendant could easily have thought Miller among their coventurers. Given that context, disclosure of additional information related to the crime in the course of explaining the need for particular steps to be taken to conceal the crime more effectively can be seen as intended to further the venture. See, e.g., *Commonwealth* v. *Raposa*, 440 Mass. 684, 690 & n.7 (2004). See also *Commonwealth* v. *Clarke*, 418 Mass. 207, 218-219 (1994) (acknowledgment to victim's cousin admissible as "an effort to appease [cousin] to prevent him from reporting the crime").

escape warrant the inference that the joint venture continued through the time the statements were made").

It is of no consequence that the defendant was not present at the meetings at which the contested statements were made. See, e.g., *Commonwealth* v. *Stewart*, 454 Mass. 527, 534-536 (2009). Absent some affirmative indication that the venture had terminated, or that the defendant had withdrawn from it,[22] we do not treat attempts to conceal the criminal actions and purposes of a pre-existing joint venture as constituting a new venture requiring a separate evidentiary foundation. See *id.* at 537 (where statements were "made shortly after the murder . . . [a]bsent clear indication that the venture had ended, it is reasonable to infer that concealment of the venture was ongoing"); *Commonwealth* v. *Angiulo, supra* at 519-520 ("Absent a circumstance such as where the declarant had been incarcerated . . . or . . . apprehended . . . we cannot say that the joint venture had terminated . . ."); *Commonwealth* v. *Andrews*, 403 Mass. 441, 446 n.4, 453-454 (1988) (absent showing that separately tried coventurer had fled jurisdiction only subsequent to defendants' arrest, coventurer's flight and use of false name "admissible as evidence against the defendants"). Because there was no such indication here, the judge did not err in inferring that the joint venture continued for the purposes of concealing the venturers' participation in the murder.

b. *Gang testimony.* The defendant next contends that his counsel should have been permitted to elicit testimony concerning the alleged gang affiliations of a number of individuals related to the case, including Sherrod and the victim. The defendant sought to argue, on the basis of such evidence, either that the victim and Sherrod were members of rival gangs or, alternatively, that the victim had been a member of Sherrod's gang, the "Money Getters," but had betrayed them by stealing the gang's money.

In the defense view, such evidence would have been exculpa-

---

[22]Such an indication may be by way of evidence that former coventurers had stopped cooperating in efforts to conceal the crime, *Commonwealth* v. *Dahlstrom*, 345 Mass. 130, 133-134 (1962); *Commonwealth* v. *Pringle*, 22 Mass. App. Ct. 746, 751-752 (1986), or that the declarant was already under arrest for the crimes charged. See, e.g., *Krulewitch* v. *United States*, 336 U.S. 440, 442 (1949); *Commonwealth* v. *Drew*, 397 Mass. 65, 69, 71 (1986).

tory even though it was largely consistent with the Commonwealth's theory of the crime: that Sherrod had paid the defendant, his younger brother, to kill the victim in retribution for the victim's theft of drug money. The defendant argues that the existence of a gang connection, and thus the existence of other gang members with a possible motive for the crime, might nonetheless have raised in the minds of the jury the possibility that another gang member had committed the murder.[23] See *Holmes* v. *South Carolina*, 547 U.S. 319, 326-327 (2006) (recognizing qualified constitutional right to present evidence that crime was committed by another). Further, the defendant argues that he "should have been permitted to present to the jury all of the evidence of gang involvement that the police ignored."

The defendant focuses on the proffered testimony of four witnesses: Darrius Harris, Edward Forster, John Fulkerson, and Donna Bright. The defendant represented that, had the Commonwealth's objections not been sustained, Harris, the victim's half-brother, might have testified to "some suggestion that [the victim's clothing] may be part of the uniform of a gang"; Forster and Fulkerson, both police officers, might have testified that Miller told the police that the murder was revenge for the victim's having stolen $15,000 from Sherrod's gang; and Donna Bright, the defendant's mother, could have testified to an attempt on Sherrod's life shortly after the murder, which might have been intended as retribution for the murder.

"[D]emonstration that a third party committed the crimes charged is a time-honored method of defending against a criminal charge. . . . Yet that trial tactic is, like any other, limited by the fundamental principle that evidence must be relevant" (citation omitted). *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). "Evidence that another person committed the crime charged also poses a real threat of prejudice, especially the risk of confusing jurors by diverting their attention to wholly col-

[23]The jury did hear testimony suggesting that Ahart and Sherrod were involved in the drug trade, that Miller was contemplating "get[ting] into the co[caine] business," that Sherrod believed that the victim had stolen $15,000 in drug money from him, and that the victim had on his person a substantial quantity of drugs packaged for distribution.

lateral matters involving persons not on trial."[24] *Id.*, citing *Commonwealth* v. *Abbott*, 130 Mass. 472, 473-475 (1881). Because the right to present third-party culprit evidence is constitutional, *Holmes* v. *South Carolina, supra* at 327, we conduct an independent review to determine whether "matters offered in evidence for this purpose are so remote and lack such connection with the crime that they [were properly] excluded." *Id.*, quoting 41 C.J.S. Homicide § 216, at 56-58 (1991). See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 804 n.26 (2009).

Distinct from third-party culprit evidence is evidence intended to show that the police knew of, but failed to investigate, alternate suspects. See *id.* at 802-803. Such evidence is commonly referred to as *Bowden* evidence. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). We have observed that, because the Commonwealth may generally, on redirect examination, explain why particular leads were not followed, the risk of prejudice posed by *Bowden* evidence is often lower than that associated with third-party culprit evidence.[25] *Commonwealth* v. *Silva-Santiago, supra* at 803. Nonetheless, we require the trial judge to determine whether, in the particular circumstances of a case, "the probative weight of the [proffered] evidence exceed[s] the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters." *Id.* Such a determination is reversed only for "palpable error." *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990).

Here, the judge allowed defense counsel to elicit that the police "didn't do any investigation about gangs." The questions precluded by the judge related to the gang affiliation of specific individuals involved in the case. Accordingly, the evidence excluded by the judge is better characterized as third-party culprit evidence than as *Bowden* evidence. The defendant

[24]Where such a demonstration is attempted through hearsay evidence that does not fall within an exception, the defendant must also show "other 'substantial connecting links' to the crime." *Commonwealth* v. *Rice*, 441 Mass. 291, 305 (2004), quoting *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000).

[25]Where the testimony is offered "simply to prove that the police knew of the possible suspect and failed to take reasonable steps to investigate it . . . it is not hearsay . . . [and] need not meet the standard we set to admit hearsay evidence regarding a third-party culprit." *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 802-803 (2009).

emphasizes, however, that the judge's rulings also had the effect of precluding the defendant from inquiring whether the police had investigated the gang affiliations of those individuals.

However the evidence is categorized, the judge's rulings were not error. If considered third-party culprit evidence, the proffered testimony was of minimal relevance because it did not point toward any particular third party who might have committed the crime. Contrast *Commonwealth* v. *Conkey*, 443 Mass. 60, 64, 70 (2004) (where murder may have been sexually motivated, error to exclude evidence of victim's landlord's history of prior sexual assaults where he had also been aware of undisclosed details of crime); *Commonwealth* v. *Keizer*, 377 Mass. 264, 266-268 (1979) (error to exclude evidence that robbery was very similar to another that defendant could not have committed). Evidence merely raising the speculative possibility that "some third person or persons had a motive to kill the victim[]" simply does not qualify as evidence tending to show that the crime was committed by a third party. See *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 420-421 (1998) (judge properly excluded evidence of prior "La Cosa Nostra" killing which defendants argued provided motive for other members to have committed murders).

Nor does the defendant fare any better if the proffered testimony is treated as *Bowden* evidence. "We have recognized that the failure of the police to investigate leads concerning another suspect is sufficient grounds for a *Bowden* defense." *Commonwealth* v. *Silva-Santiago*, *supra* at 802. However, the only evidence offered by the defendant to show that the police should have known of a possible gang connection to the killing came from Miller's explanation to the police and to the grand jury why Sherrod had asked the defendant to kill the victim. Not only was this evidence consistent with the Commonwealth's ultimate theory of the crime, but it suggested no alternate "legitimate suspect who was not investigated by police." *Commonwealth* v. *Phinney*, 446 Mass. 155, 166 (2006). The mere fact that other gang members might also have had a motive to murder the victim was of minimal probative value absent "other information that potentially linked [such persons] to the crime." *Commonwealth* v. *Silva-Santiago*, *supra* at 804. Contrast *Com-*

*monwealth* v. *Reynolds*, 429 Mass. 388, 390 (1999) (defendant sought to elicit testimony about "two [organized crime] lieutenants who were present at the pub the night the victim was murdered"; police "informants reported that the victim had been fighting with [their] organization about money, and that the victim recently had had a violent argument with [those] lieutenants").

The proffered evidence, if relevant at all, was only tangentially relevant. It was within the judge's discretion to determine that the testimony was more likely to distract than assist the jury. We discern no error in its exclusion.

c. *Jury deliberation.* The verdicts were read by the clerk and collectively affirmed by the members of the jury; the jurors were not individually polled. Almost immediately after the jury were discharged, one of the jurors, Juror A, telephoned defense counsel to express her discomfort with the verdict. On Juror A's urging, a second juror, Juror B, also contacted defense counsel.

Jurors A and B subsequently signed affidavits, prepared by defense counsel, stating that, during deliberations, some jurors had (1) "discussed their belief that the defendant . . . had a juvenile criminal record"; (2) "discussed their belief that the defendant was selling drugs" at his high school; (3) speculated on the reasons the defendant did not testify; and (4) seemed to assign the burden of proof to the defendant, asking other jurors to justify why they should not find the defendant guilty. Both jurors stated that they did not believe in the defendant's guilt, and that they would not have affirmed the verdicts had they been polled individually in open court.

Relying on these affidavits, the defendant filed a motion for a new trial, claiming that the jury considered extraneous and prejudicial information in the course of their deliberations. The trial judge conducted two hearings on the issue, including an evidentiary hearing in which he questioned Jurors A and B. He found, consistent with their testimony, that another juror, Juror C, repeatedly had expressed his belief that the defendant had a juvenile record and had sold drugs at his high school. He found also, however, that the statements, set forth in the margin,[26] were intended and received as speculation, unsupported by any

---

[26]Juror C's comments were paraphrased by Jurors A and B in the following terms:

claim of a specific factual basis. The judge declined defense counsel's request that he question Juror C directly to determine whether his statements were mere statements of opinion or were intended as statements of fact.

It is axiomatic that we may not "venture[] into the forbidden area of the deliberative process of" individual jurors. *Commonwealth* v. *Cuffie*, 414 Mass. 632, 638 (1993). "In the interior workings of a jury there is room for impropriety that is short of unlawfulness." See *Commonwealth* v. *Guisti*, 434 Mass. 245, 252 n.9 (2001), quoting *Commonwealth* v. *Scanlan*, 9 Mass. App. Ct. 173, 184 (1980). "We cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies . . . ." *Commonwealth* v. *Fidler*, 377 Mass. 192, 199 (1979), quoting *Government of the V.I.* v. *Gereau*, 523 F.2d 140, 151 (3d Cir. 1975), cert. denied, 424 U.S. 917 (1976). Accordingly, jury verdicts are impeachable by the postverdict statements of jurors only on the narrowest of grounds. Cf. *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 857-585 (2011) (no hearing necessary notwithstanding juror's representations that she was subjected to hours of "constant interrogation" with other jurors "screaming, swearing, and throwing books" at her, "that some jurors had made up their minds 'from day 1,' " and that foreperson refused to tell the judge that jury were deadlocked); *Commonwealth* v. *Semedo*, 456 Mass. 1, 21 (2010) (letter by two jurors claiming "jurors ignored the judge's instructions and the presumption of innocence" did not impeach verdict); *Commonwealth* v. *Mahoney*, 406 Mass. 843, 854-855 (1990) ("the judge should have denied [a] motion" to conduct in camera interview of juror who wrote

---

With respect to the defendant's purported juvenile record: that the defendant "probably has a record a mile long"; that "[h]e definitely has a record, they all do, they're just not showing it because he's juvenile"; "that it's possible that he had one, but there's a chance that they might not show it in his record because he was a juvenile."

With respect to the defendant's purported drug distribution activities: "Who are you kidding? He was selling drugs [at school]"; "[h]e's not a goody-two-shoe tennis player, who are you kidding"; that, in light of Sherrod's "apparently selling drugs, . . . there's a very likely chance that he was selling drugs in school."

Other jurors agreed with and echoed Juror C's statements after he made them.

in letter to court, "We were told to confine our deliberations to the evidence. . . . I do not believe this happened").

Because the judge found, and the defendant does not contest, that Juror C's statements did not reflect racial bias, the sole pertinent ground for impeachment of the verdicts here is testimony that the jury considered extraneous factual material not placed in evidence at trial. See *Commonwealth* v. *Pytou Heang, supra* at 858. The question whether a juror's exposure to extraneous material "raises a serious question of possible prejudice" is committed to the sound discretion of the trial judge. *Commonwealth* v. *Jackson,* 376 Mass. 790, 797, 800 (1978). Further, "[t]he standard of review of findings made in a postverdict inquiry is clear error." *Commonwealth* v. *Kincaid,* 444 Mass. 381, 383 (2005). Nevertheless, a failure adequately to investigate a juror's exposure to extraneous material prior to ruling on the prejudicial effect of such material can require reversal. *Commonwealth* v. *Dixon,* 395 Mass. 149, 152 (1985).

For example, in *Commonwealth* v. *Cuffie, supra* at 635, a juror informed the judge that a second juror "went to the scene [of the crime] to check it out." We determined that, because the judge credited the report of the first juror, he had before him "a 'significant' or 'considerable' indication that an extraneous matter . . . had infected the jury's deliberations." *Id.* at 636, quoting *Commonwealth* v. *Dixon, supra* at 151. Accordingly, he could not simply rely on the first juror's equivocal statement (i.e., "It doesn't really seem" the second juror relied on anything she saw at the scene during deliberations) but was instead required to further investigate the issue by interviewing the second juror. *Commonwealth* v. *Cuffie, supra* at 635-636 & n.2.

The defendant places significant reliance on the *Cuffie* decision, but it is misplaced. The questions posed to the first juror in that case unambiguously reflected that at least one juror had been exposed to extraneous information related to the case through an uncontrolled view of the scene. Here, in contrast, the judge's questioning of Jurors A and B did not suggest that any juror had been exposed to extraneous factual material. Rather, the trial judge found that Juror A's and B's testimony showed that Juror C did no more than express his "subjective opinion[]," *Commonwealth* v. *Fidler, supra,* of the defendant's character and propensity to criminality.

The defendant focuses on statements such as "Come on, who are you shitting, that kid was selling drugs," stating that on their face these statements contain factual representations. But the defendant neglects to account for the conversational context in which the statements were made and for the specific testimony of Juror A that Juror C did not "indicate that he had any information on the subject" and was "[j]ust saying that's what he believed." As we have previously recognized in an identical context, opinions are often phrased as conclusory or generic statements of fact. See *Commonwealth* v. *Laguer*, 410 Mass. 89, 97 (1991) ("speculat[ion] about the defendant's early departure from the Army because of sexual misconduct . . . more . . . a matter of attitude, than of purported authoritative information," although context of statements required further inquiry as suggestive of ethnic bias). Contrast *Commonwealth* v. *Fidler*, *supra* at 194 (during deliberations juror stated that defendant had been shot at one month earlier). A juror who exclaims, "Come on . . . that defendant is lying," would hardly be taken by his peers as having inside knowledge of the defendant's veracity. It was entirely reasonable for the judge to conclude from the testimony at the voir dire hearing that Juror C was simply engaged in argument.

We note two additional considerations that bear on our decision to affirm the judge's ruling. First, the judge did not simply fail to investigate the allegations in the affidavits. Rather, he conducted an evidentiary hearing. See *Commonwealth* v. *Jackson*, *supra* at 800. Only after that hearing disclosed no evidence of an extraneous influence did the judge decline to act further, supporting his decision in a detailed, written opinion. In other words, this is not a case where the judge failed to exercise his discretion. Cf. *Commonwealth* v. *Fredette*, 56 Mass. App. Ct. 253, 259 n.10 (2002) ("Failure to exercise discretion is itself an abuse of discretion").

Second, the deliberations in this case extended over more than six days. The testimony of Jurors A and B reflected that the atmosphere in the jury room was at times contentious. That improvident statements were made in the course of heated and extended debate will not suffice to impeach the verdict. See, e.g., *Commonwealth* v. *Semedo*, 456 Mass. 1, 23 (2010) (letter

from juror to judge stating that the author and another juror voted guilty "because they 'did not want to endure any more verbal abuse' " did not require additional investigation).

d. *Assault conviction.* The defendant's final claim is that his conviction of assault by means of a dangerous weapon violates art. 12. We agree.

Article 12 "requires that no one may be convicted of a crime punishable by a term in the State prison without first being indicted for that crime by a grand jury." *Commonwealth* v. *Barbosa*, 421 Mass. 547, 549 (1995). An indictment suffices to charge a crime if, inter alia, "it would 'enable the defendant to plead the conviction or acquittal in bar to another prosecution for the same offence.' " *Commonwealth* v. *Hare*, 361 Mass. 263, 267 (1972), quoting *Commonwealth* v. *Bracy*, 313 Mass. 121, 125 (1943). In other words, an indictment on one crime may support a conviction of another where the two crimes are not distinct "statutory offenses" for the purposes of the double jeopardy clause. See *Commonwealth* v. *Vick*, 454 Mass. 418, 430-432 (2009).

The second indictment against the defendant stated a charge of armed assault with intent to murder, G. L. c. 265, § 18 (*b*). See G. L. c. 277, § 79. However, the jury were instructed that they could find him guilty of assault by means of a dangerous weapon, and they did so.

The judge erred in instructing the jury on assault by means of a dangerous weapon. That offense is not a lesser included offense of armed assault with intent to murder, the crime for which the defendant was indicted. Each of those crimes requires proof of an element absent from the other. See *Commonwealth* v. *Vick*, *supra* at 432. Specifically, armed assault with intent to murder requires a showing of a specific intent to kill, whereas assault by means of a dangerous weapon requires only a general intent to commit a battery or to place the victim in reasonable apprehension of an imminent battery. See *id.* Conversely, assault by means of a dangerous weapon requires proof that the defendant used the weapon in the course of the assault, whereas armed assault with intent to murder requires only that the defendant be armed at the time of the assault; "the weapon need not have been used." *Salemme* v. *Commonwealth*, 370 Mass. 421,

424 (1976), citing *Commonwealth* v. *Williams,* 312 Mass. 553, 556 (1942).

As the Commonwealth points out, the latter distinction is in practice a fine one, particularly where, as here, the assault does not culminate in a battery.[27] However, it is within the Legislature's power to define distinct crimes covering similar conduct, and "we consider only the elements of the crimes, not the facts to be proved or the evidence adduced to prove them." *Commonwealth* v. *Vick, supra* at 431, quoting *Commonwealth* v. *Cabrera,* 449 Mass. 825, 827 (2007).

Because armed assault with intent to murder and assault by means of a dangerous weapon are distinct statutory offenses, and because the defendant was indicted for the former but convicted of the latter, he is entitled to have this conviction reduced to simple assault, a lesser included offense of both crimes.[28] See *Commonwealth* v. *Dixon,* 34 Mass. App. Ct. 653, 657-658 (1993). Cf. *Commonwealth* v. *French,* 462 Mass. 41, 49 (2012) ("an appellate court may indeed reduce a conviction in certain circumstances to rectify error").

3. *Conclusion.* The defendant's convictions of murder in the second degree and possession of a firearm are affirmed. The defendant's conviction of assault by means of a dangerous weapon is vacated and the verdict is set aside. The case is remanded to the Superior Court, where a judgment of conviction of simple assault, G. L. c. 265, § 13A (*a*), shall enter.

*So ordered.*

---

[27] A difference does exist, however. For example, an individual who, while carrying a weapon, lunges at another so as to strangle him or her to death, but misses, is guilty of armed assault with intent to murder but not of assault by means of a dangerous weapon.

[28] "Where there is a substantial risk that the defendant was convicted of a crime for which he was not indicted by a grand jury, we cannot apply a harmless error standard" to save the conviction. *Commonwealth* v. *Barbosa,* 421 Mass. 547, 554 (1995). Accordingly, we need not address whether an objection was properly made at trial.