NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1351                                    Appeals Court

COMMONWEALTH  vs.  MARWAN M. ALMELE.

No. 13-P-1351.

Bristol.      December 9, 2014. - March 27, 2015.

Present: Cohen, Fecteau, & Massing, JJ.

Controlled Substances. Joint Enterprise.  Evidence, Joint
    enterprise, Expert opinion. Practice, Criminal, Objection,
    Motion in limine. Witness, Expert.

Complaint received and sworn to in the New Bedford Division
of the District Court Department on October 22, 2010.

The case was tried before Christopher D. Welch, J.

Patrick A. Michaud for the defendant.
Shoshana E. Stern, Assistant District Attorney, for the
Commonwealth.

FECTEAU, J.  The defendant appeals from his convictions,

following a jury trial in the District Court, of unlawful

possession of class B and C controlled substances with intent to

distribute, in violation of G. L. c. 94C, §§ 32A(a) and 32B(a),

respectively, and possession of a class B controlled substance,

in violation of G. L. c. 94C, § 34.[1] He contends that the judge erred in permitting statements of a purported coventurer to be admitted against him without sufficient evidence, independent of those statements, of the existence of such a joint venture or conspiracy of which he was a part. He further contends that his motion for a required finding of not guilty was denied in error as evidence of his involvement as a joint venturer was insufficient. He also complains that opinion testimony from a police officer was erroneously admitted in evidence and that the officer impermissibly offered an opinion on the defendant's guilt. As we are unpersuaded by these contentions, we affirm the convictions.

Background. From the evidence admitted during the Commonwealth's case in chief, including statements of the defendant's nephew, alleged by the Commonwealth as a coventurer of the defendant, the jury could have found the following facts.[2] On October 21, 2010, Captain Paul Oliveira of the New Bedford police department drug unit began a drug investigation as a

---

[1] The defendant was also acquitted of a charge of conspiracy to violate drug laws, G. L. c. 94C, § 40, after waiving his right to a separate trial.

[2] Before the jury were allowed to hear the content of any of the police conversations with the coventurer, the judge required the Commonwealth to introduce independent evidence of the joint venture. Following the judge's preliminary ruling, and a limiting instruction to the jury, the prosecutor was permitted to backtrack and fill in the chronology of events with the statements in question.

result of a call to the department's anonymous tip line. He called the phone number that was provided through the tip, and spoke a number of times with one Ahmad, a person whose voice he recognized as someone who had provided information to him in an investigation a few years earlier. In speaking with Ahmad, Oliveira testified that he had heard that Ahmad was "trying to get rid of some Percocets," and Oliveira indicated that he was interested in purchasing the pills. Ahmad agreed, but explained that the pills were not his but his uncle's, who got thirty-milligram and ten-milligram pills by prescription, 180 of each per month, but had just twenty thirty-milligram pills remaining for sale, for "500 bucks, thirty bucks a pill." He continued that his uncle "likes selling them in 100, 100-pack," and would give a much better deal if Oliveira bought in that quantity. Ahmad explained that his uncle had "just sold 100, his last 100 of the, ah, of the tens," for $400, or four dollars per pill, and if he [Oliveira] wanted to buy 100 pills next time, Ahmad said, he could get him a better deal than the thirty dollars per pill he was currently offering.

They discussed arrangements for a purchase, including that Oliveira would have to pick him up and bring him to his uncle's house, as Ahmad had no other way of getting there, and because his uncle was babysitting and could not get to Ahmad's house. The arrangement also included the location for picking him up,

that the $500 be shown up front, and that Ahmad would then direct Oliveira to his uncle's house, from which his uncle would emerge and do the deal outside so that Oliveira would neither have to give the money to Ahmad nor have to go inside the house himself.  Because Oliveira was fearful that Ahmad would recognize him, he arranged with Detective Candido Trinidad, another member of the narcotics unit, to act in his stead, having explained to him the arrangements he had made with Ahmad.

At the time Trinidad approached the location to pick up Ahmad, Oliveira, who was surveilling him, was on the phone with Ahmad, and could see Ahmad walking down the street "watching," while talking on the phone with him.  Trinidad picked up Ahmad, who sat in the front passenger seat, and they drove to 480 Cottage Street, Ahmad's uncle's house.  Along the way, they spoke about the possibility of Trinidad's purchasing more pills in the future from Ahmad's uncle, at a discounted rate.  Ahmad also kept asking Trinidad if he was a police officer, but Trinidad assured him that he was not.

As they neared the house and stopped, and after Ahmad presumably made a cellular telephone call to his uncle, who did not pick up, Ahmad said that he "would go in and get him and then come back out."  When Ahmad went inside the house at 480 Cottage Street, Trinidad called Oliveira and told him Ahmad was going to get the "third party," since Ahmad having to get out of

the car had not been discussed previously. Minutes later, Ahmad came out of the house, got back in the front passenger seat of Trinidad's car, and told him that his uncle would "be right out." After another minute or two, the defendant came out of the house, and Ahmad said, "That's my uncle right there." The defendant walked to the passenger side of the car, and "he leaned over, he looked in, and he put his hand out." Trinidad, holding the money in his left hand to make it visible to the defendant, shook the defendant's proffered hand with his right hand, as the defendant "stayed leaning over, leaning into the car." At this point, Oliveira gave the order to other detectives to move in and seize the defendant.

The defendant was searched and found to have twenty Percocet tablets in a small Ziploc bag in his sweatshirt pocket, another three thirty-milligram Percocet tablets loose in a sweatshirt pocket, thirty Klonopin pills and two Suboxone tablets in his right front coin pocket, and $416 in cash. In response to the defendant's proffered explanation that he had prescriptions, and his offering to show the prescription bottle for the Percocets, police retrieved the bottle from inside the house, but it was empty; the prescription label indicated it had been filled with a month's supply of 180 thirty-milligram pills six days earlier. The defendant failed to provide an explanation for the absence of the rest of the pills.

Lieutenant Dennis Ledo, testifying as a nonpercipient expert witness, explained various methods of drug investigation, including "controlled" and "undercover" drug buys.  He testified to typical methods of street dealings in illegal drugs, including prescription drugs.  Ledo's explanation included the use of subordinate dealers, termed "runners," who brokered deals, met with potential buyers on the seller's behalf, and placed orders with the seller on the buyer's behalf, often for a share of either the cash or the drugs.  Ledo explained that in the greater New Bedford area, prescription drugs would be packaged in clear plastic bags, and Percocets would sell for "[r]oughly a dollar [per] milligram."  He also explained to the jury the different forms that oxycodone took (Percocet, Oxycontin), that people both swallow and snort it, and that other prescription drugs like Xanax and Klonopin were also "bought and sold on the street in New Bedford."

Noting for the jury that Ledo had not been involved in the case other than to give opinion testimony based on reading "the [investigative] report regarding" it, the prosecutor asked, "Now, if you could describe for the jury if an individual is arrested with, um -- and, I believe it was, ah, plastic baggies of two, ah, Suboxone tabs, thirty Klonopin, as well as twenty Percocets, along with $416 on his person, what significance would that have for you?"  Defense counsel objected, and the

judge noted the objection and delivered a two-page jury instruction explaining that Ledo was going to be allowed to "render an opinion based on facts in evidence," but the jury were under no compulsion to accept that opinion or to value him more highly as a witness simply because he was allowed to give opinion testimony, and that it was up to them to determine whether the asserted facts underlying his opinion "have been proven to begin with." Following this lengthy instruction, the prosecutor asked Ledo whether he was "able to form an opinion after reading the . . . report"; he said he had. The prosecutor asked him what the basis of his opinion was; he replied, "The basis was . . . my training and experience, based on the facts that, ah, I read in the, ah, in the investigative report." The prosecutor then asked him, "And, ah, what was your opinion after reading this report?" He replied, "My opinion was that the, ah, drugs that were found on the [d]efendant were intended for distribution." Defense counsel made no objection to the form of this answer. Ledo then went on to explain in detail which facts in the report led him to this conclusion, based on his experience with narcotics cases generally.

The defense. Given the verdict, the jury obviously discredited the defendant's evidence, consisting of testimony from his former neighbor, Dennis Cavaleri, and the defendant's wife, both of whom offered an explanation for his possession of

the Suboxone and Klonopin pills.[3]  Also testifying was his former tenant Michael Stuart, as well as the defendant.  Stuart testified that, on October 21, it appeared that the defendant was preparing to take a trip to Boston, as Stuart saw the defendant taking pills from two bottles and putting them into plastic bags.  Stuart also testified that he saw the defendant walk over to the car in which Trinidad and Ahmad were sitting and saw him arrested within seconds as he turned to leave.

Finally, in addition to corroborating the information from the prior defense witnesses, the defendant testified that Ahmad called him that day, and later came over to his house and stated[4] that a man in the car outside had a gun to his head and he asked the defendant to come outside to look at the man, which he did, saying hello to the unknown man.  Shortly thereafter, he was arrested.  The defendant explained that his prescription pill bottle was completely empty because he kept the remaining pills

---

[3] Cavaleri testified that the defendant had given him a ride earlier in the day to a store, and that Cavaleri had accidentally left "[t]wo Suboxone tablets," which had been prescribed to him, in the defendant's car, which the defendant agreed to hold for him until he could pick them up later.  The defendant's wife testified that her prescription for forty-five Klonopin pills had just been refilled and picked up by the defendant.  In preparation for a trip to Boston, the defendant had counted out and bagged forty-five Klonopin pills and "h[e]ld[] onto them" for her, and did the same with his own medicine.

[4] Ahmad's hearsay statements, as related by the defendant, were admitted only for consideration of the defendant's state of mind upon hearing the statements.

in a different place, and the cash on his person derived from a $500 rent payment that Stuart's girlfriend had just given him.

Discussion. A. Coventurer statements. The defendant claims that the judge erred in his preliminary finding that there was sufficient evidence, independent of the statements of his nephew, that he and Ahmad were engaged in a joint criminal enterprise to permit the jury to consider Ahmad's statements against him. Relatedly, he also contends that the judge denied his motion for a required finding of not guilty in error, as evidence of a joint venture was insufficient to submit the case to the jury even when the statements of Ahmad are considered. See Mass. G. Evid. § 801(d)(2)(E) (2014).

The judge properly considered and ruled, on a preliminary basis, whether to admit the statements of Ahmad. As the Supreme Judicial Court has explained, a "judge may allow the admission of such statements, but only after a preliminary determination, based on a preponderance of admissible evidence other than the out-of-court statements themselves, that a criminal joint venture existed between the declarant and the defendant, and that the statement was made in furtherance of the venture." Commonwealth v. Bright, 463 Mass. 421, 426 (2012). "Such a preliminary determination permits a coventurer's out-of-court statements to come before a jury but does not suffice to permit the jury to consider the statements as bearing on the

defendant's guilt. Rather, the jury must first make their own independent determination, again based on admissible evidence other than the statements themselves, on 'the same questions' that the judge must pass on." Id. at 426-427, quoting from Commonwealth v. Borans, 379 Mass. 117, 145 n.26 (1979). See Commonwealth v. Braley, 449 Mass. 316, 319-320 (2007).

Here, there was evidence independent of the content of Ahmad's statements.[5] Therefore, on the facts presented, the judge properly exercised his discretion to permit the jury to consider Ahmad's statements as made during the course of, and in furtherance of, the joint venture; similarly, the jury were warranted in determining the existence of the venture, of which the defendant was part.[6]

B. Drug expert testimony. 1. Preservation of issue. We disagree with the defendant's assertion that he properly preserved his claim that the Commonwealth's drug expert erroneously intruded on the jury's function by offering his

_____

[5] See discussion supra.

[6] We also consider the Commonwealth's evidence of a joint venture, taken in a light most favorable to the Commonwealth, to have been sufficient to submit the case to the jury. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979). We take Ahmad's statements into account, notwithstanding the defendant's argument concerning their admissibility. See Commonwealth v. Bright, supra. We also find the defendant's contention that the judge improperly failed to "suppress" the coventurer statements to be nothing more than a recast of his argument that the admission of the evidence was in error, and thus, it is likewise, meritless.

opinion of the defendant's guilt.  We acknowledge that the judge, at the conclusion of the voir dire hearing concerning the Commonwealth's motion in limine, "preserved" the defendant's general objection to Ledo's testimony and excused further need for objection during trial.[7]  Nonetheless, we consider this claim of error not to have been properly preserved, since the questions posed to the witness were not objectionable.  Instead, the error, if any, was the language used by the witness to answer one question.  In such a circumstance, the defendant was obligated to object or move to strike the answer, which was not done.  See Commonwealth v. Womack, 457 Mass. 268, 272-273 (2010) ("Defense counsel successfully objected to the statement that contained the first allegedly accusatory statement, but he did not move to strike the statement.  This matter is not preserved").  See also Commonwealth v. Martin, 48 Mass. App. Ct. 391, 393 (1999); Commonwealth v. Rosado, 59 Mass. App. Ct. 913, 914 (2003).  Consequently, we review the defendant's claim to determine whether a substantial risk of a miscarriage of justice was created.  Before we address the merits of this issue,

---

[7] The defendant's contention during the hearing on the Commonwealth's motion in limine was primarily that the opinions intended to be offered by the Commonwealth's expert, particularly on the methods of street dealing and packaging of prescription drugs and the use of runners, was within the common knowledge and experience of the jury.

however, we must express a note of caution about the practice of "saving rights."

Although we recognize that a judge may "save" or "preserve rights," which could excuse, in some circumstances, the need for objection contemporaneous with the actual proffer of evidence, see Commonwealth v. Aviles, 461 Mass. 60, 66 (2011), we discourage the practice. While the intended purpose of a motion in limine is worthwhile, its purpose is "to prevent irrelevant, inadmissible or prejudicial matters from being admitted in evidence." See Boston v. Board of Educ., 392 Mass. 788, 796 (1984), quoting from Commonwealth v. Hood, 389 Mass. 581, 594 (1983). A motion in limine is not an adequate substitute for a properly placed objection. See Commonwealth v. Whelton, 428 Mass. 24, 25-26 (1998). By the judge saving rights, and excusing the need for a contemporaneous objection, the proponent of evidence challenged on appeal is deprived of an opportunity during trial to rephrase the question in light of an objection. Moreover, by requiring an objection at the time the evidence is actually offered, the judge is given an opportunity to reconsider his earlier ruling to determine its continued correctness in the context of a question actually posed and the answer given. As stated in Commonwealth v. Jones, 464 Mass. 16, 18 (2012), "[w]ithout an objection at trial, which gives the judge an opportunity to reconsider the issue in context, any

harm resulting from a ruling in limine is purely speculative. See Luce v. United States, 469 U.S. 38, 41-42 (1984) ('The ruling is subject to change when the case unfolds . . . . Indeed even if nothing unexpected happens at trial, the . . . judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling')."[8]

2. The merits. The defendant correctly does not take issue here with the qualifications of Ledo to give opinion testimony on the illegal street trade of controlled substances. Rather, he complains, first, that opinions expressed by the officer concerning, for example, typical street drug traffic, the packaging of drugs, and the use of runners as middlemen were unnecessary, because they were within the common knowledge of jurors. In addition, the defendant contends that the opinions were invalid since they were based in part upon unreliable evidence from Ahmad. Primarily, though, he contends that the officer's opinion that "the drugs . . . found on the defendant were intended for distribution," and that the $416 found on him were "proceeds from the sale of drugs," invaded the province of

---

[8] To the extent that the failure of trial counsel to move to strike this answer sounds in ineffectiveness, an issue that was held determinative in the case of Commonwealth v. Sepheus, 468 Mass. 160, 171-172 (2014), we note that, unlike the case here, in Sepheus the expert's opinion was so critical on the element of intent to distribute that, without it, allowance of a motion for a required finding was held to have been necessary.

the jury because the officer commented on the guilt of the defendant, the ultimate issue to be decided by the jury.

It is well established that "trial judges have broad discretion to allow the use of narcotics investigators as experts in drug cases." Commonwealth v. Miranda, 441 Mass. 783, 793 (2004), citing Commonwealth v. Johnson, 413 Mass. 598, 604 (1992). "The judge's decision to allow this type of evidence 'will be reversed only where the admission constitutes an abuse of discretion or error of law.' Commonwealth v. Johnson, 410 Mass. 199, 202 (1991)." Commonwealth v. Little, 453 Mass. 766, 768-769 (2009). As the court in Little further explained, "[o]therwise qualified expert testimony is admissible if, 'in the judge's discretion, the subject [of such testimony] is not within the common knowledge or common experience' of the trier of fact, and the testimony will assist the trier of fact in determining a fact in issue or in understanding the evidence." Id. at 768, quoting from Commonwealth v. Miranda, supra at 792-793. "That rule, however, is not rigid; and even in cases where the subject matter may be within the knowledge or common experience of the trier of fact, expert testimony will be admissible if, in the judge's discretion, it may be of assistance." Ibid., quoting from Miranda, supra. See P.J.

Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 7.6.1 (7th ed. 1999).  See generally Mass. G. Evid. § 702 (2008-2009).[9]

Here, the closer question is whether the conclusory opinions of Ledo, to the effect that the drugs found in the possession of the defendant were being held for distribution, improperly invaded the province of the jury.  Generally, "[o]pinion evidence elicited from . . . a qualified expert properly informs the jury of the significance of evidence generally, and does not state an opinion as to the ultimate issue of intent, which must be resolved by the jury (or judge as a fact finder)."  Commonwealth v. Grissett, 66 Mass. App. Ct. 454, 457 (2006).  "Opinion testimony may 'touch' on an ultimate issue in the case . . . if couched appropriately, but such testimony can never directly speak to, or express a point of view, on the issue of guilt or innocence."  Id. at 457-458.  See Commonwealth v. Tanner, 45 Mass. App. Ct. 576, 579 (1998).  "Where a specified intent is an element of the crime, a witness's opinion as to what the defendant intended is improper.

---

[9] With respect to the witness's generalized opinions about the typical methods of street drug operations, including the packaging and value of prescription drugs in illicit sales and use of runners, we see no error or abuse of discretion, as support for such opinion testimony can be seen in numerous decisions, several of which are cited supra.  Nor do we agree with the defendant's unsupported characterization of Ahmad as an "unreliable" basis for the officer to rely, in forming his opinions; moreover, the Ledo's opinions were primarily based on the testimony of the lead and undercover officers, the drugs found on the defendant, and other facts in evidence.

Standing alone, such evidence cannot sustain a conviction." Commonwealth v. Santiago, 41 Mass. App. Ct. 916, 917 (1996). See Commonwealth v. Woods, 419 Mass. 366, 375 & n.13 (1995) (improper testimony from officers that, "as a matter of their expert opinion, . . . a drug transaction had taken place").

The drug experts at issue in Woods and Tanner were percipient witnesses to the drug transactions at issue; in addition to having described what they observed, they also concluded that the defendant had committed a particular offense, based on their observations and expertise. Contrary to the situation in Woods, supra, and Tanner, supra, the witness here was not percipient to the events in question, and thus, concerns about a percipient witness also testifying as an expert witness are not implicated. Compare Tanner, supra at 579, 582 (noting that "[i]t is easy for the line between specific observations and expert generalizations to become blurred," and "[t]he testimony of a combined expert/percipient witness has unique persuasive value").

Here, Ledo began his testimony with a series of opinions, properly expressed, that explained in general terms typical methods of drug dealers and the packaging of prescription drugs and their value. Drawing his attention to the case at hand, he was asked and agreed that he had read the police report for this case, upon which he relied to form the basis of the opinions

about which the defendant takes primary issue.  He was then properly asked, hypothetically, if a person having in his possession certain quantities of prescription drugs packaged separately had significance to him, based on his training and experience.  Such a question was not improper.  "Questions grounded in previously admitted evidence may be posed to an expert witness calling for an opinion within the expert's field of expertise, even if the witness's reply thereby touches on the ultimate issue of the case."  Tanner, 45 Mass. App. Ct. at 579. See Grissett, 66 Mass. App. Ct. at 457, quoting from Commonwealth v. Wilson, 441 Mass. 390, 401 (2004) ("[S]uch testimony may be admitted only if it is 'limited to an opinion that the hypothetical facts were consistent with possession of [subject drugs] with the intent to distribute'").

Immediately following this question was a lengthy special instruction, given to the jury in detail by the judge concerning their use and consideration of opinion testimony that placed the testimony in proper context.[10]  After this special instruction, the prosecution resumed questioning Ledo, who then responded to the earlier question posed by the prosecutor asking the witness,

---

[10] Among instructions given to the jury at this point in the trial, the judge told them that Ledo was going to "render an opinion based upon facts in evidence" and that "you have to determine whether those facts have been proven to begin with, and, ah, if you find those facts have been proven, then you can, accept, reject, or what, do whatever you want with the opinion."

in effect, to provide his opinion concerning when an individual is arrested with certain baggies of the substances in question. Ledo responded that, based on the report, "the drugs that were found on the defendant were intended for distribution." There was no motion to strike the answer as improper. While the answer was not in the approved hypothetical and "consistent with" form, and was improper in isolation, we view it as having been built upon information already admitted in evidence. See Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 182-183, 185-186 (2009) (court held that, while close, admission of officer's testimony was not error when he replied to hypothetical question that "it would lead me to believe that there may have been a drug transaction," because he was a nonpercipient witness and his response was based on evidence that had been admitted). Therefore, "based on the compelling evidence properly admitted, and the judge's limiting instructions, we conclude, with fair assurance, that the jury's judgment was not substantially swayed by the error." Commonwealth v. Canty, 466 Mass. 535, 545 (2013).

Even if we were to conclude that the opinion as expressed would have, upon objection or motion, been struck in the form given, we are satisfied that no substantial risk of a miscarriage of justice resulted in this case.

Judgments affirmed.