NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1120                                        Appeals Court

MARY ELLEN WESSELL  vs.  MINK BROOK ASSOCIATES, INC., & another.[1]


No. 14-P-1120.

Worcester.     April 7, 2015. - August 5, 2015.

Present:  Kantrowitz, Kafker, & Hanlon, JJ.


Massachusetts Wage Act.  Attorney at Law, Disqualification,
    Attorney-client relationship, Conflict of interest.
    Employment, Retaliation, Termination.  Damages, Wrongful
    discharge of employee, Back pay.  Practice, Civil,
    Instructions to jury, Damages.



Civil action commenced in the Superior Court Department on
June 19, 2012.

A motion to disqualify the plaintiff's attorney was heard
by David Ricciardone, J., and the case was tried before him.


Gregg S. Haladyna for the defendants.
Steven D. Weatherhead (John F. Welsh with him) for the
plaintiff.


KANTROWITZ, J.  This case involves a dispute between an

employee and her former employer regarding unpaid wages.  The

plaintiff, Mary Ellen Wessell, successfully sued Mink Brook

_____

[1] Robert C. Stone.

Associates, Inc. (Mink Brook), and owner Robert C. Stone under the Wage Act for lost wages and retaliatory discharge after Stone refused to issue her a paycheck, she complained, and she was fired.

In this appeal, the defendants argue that the trial judge improperly denied their pretrial motion to disqualify opposing counsel because Wessell's attorney, who was her long-time personal friend, had previously provided informal legal advice to her on certain topics in Wessell's capacity as an employee of Mink Brook. The defendants also contend that the judge improperly instructed the jury on compensatory damages on the retaliation claim. We affirm.

Background.[2] Mink Brook was incorporated in 1993 as a franchisee of Paul Davis Restoration, a national company that performed restoration work on houses to mitigate damage from flooding, fire, mold, or other problems. Stone was Mink Brook's owner and president. In 2007, Stone contacted Wessell to discuss hiring her to work on the company's financial matters and record-keeping. She joined Mink Brook in its Worcester office as a subcontractor at an hourly rate, and in 2008 she

_____

[2] Our recitation includes both evidence put before the judge on the defendants' pretrial motion to disqualify Wessell's counsel and evidence put before the jury at trial. The latter we generally present in the light most favorable to Wessell. Much was undisputed, but where there was a relevant conflict, or a finding by the judge, we will so note.

became the company's "business manager" at an annual salary of $50,000. Wessell's duties included managing accounts, human resources, payroll, bookkeeping, insurance policies, vehicle registration, and licenses. She would occasionally work from home on a laptop computer that Stone purchased. Wessell also performed unpaid work duties during her vacations or at times outside of her business hours. Employees received paychecks every two weeks. Wessell testified that she worked about fifty hours per week.[3]

During Wessell's employment at Mink Brook, she occasionally sought informal legal advice from a close friend, Attorney John Welsh, whom she had known for many years.[4] In 2008 and 2009, Wessell consulted with Attorney Welsh on a former employee's breach of postemployment covenants, and Welsh drafted a cease-and-desist letter. In 2010, on matters involving another former employee, Wessell exchanged electronic mail messages (e-mails) with Welsh, and he reviewed correspondence that Mink Brook sent

---

[3] In April, 2011, Wessell was involved in a car accident, which required approximately eight weeks of recuperation and lost work. When Stone protested the lost time, Wessell worked part-time from home. She was paid at an hourly rate.

[4] Attorney Welsh stated in an affidavit that "I have known Ms. Wessell for over 35 years. She has been my sister's best friend since grade school." He further stated that "Ms. Wessell would call me intermittently (once every 12-18 months) for advice concerning personnel issues she was handling on behalf of the company."

to the Attorney General's office.  Sometime in 2010, Welsh notified Wessell that he would no longer provide legal advice to Mink Brook.[5]  However, on June 15, 2011, Wessell again contacted Welsh, who agreed as a "friend" to provide advice on an issue involving building access by a Mink Brook job applicant who had a physical disability.[6]

Wessell testified that as of late 2011, she observed numerous problems or irregularities with the company's finances and operations.[7]  She informed Stone of some of her observations, including her belief that an employee was "stealing from him." Stone said "[b]asically nothing" in response to this information.

---

[5] Welsh stated in his affidavit that he stopped providing legal advice to Mink Brook because he found Stone's treatment of Wessell to be unacceptable.  Additionally, he had a billing and stolen property dispute with Mink Brook regarding work performed on his home.  The defendants dispute receiving notice that Welsh's legal advice stopped in 2010.

[6] The defendants also alleged that Welsh helped Wessell prepare an employee handbook for Mink Brook.

[7] Regarding Mink Brook's finances, Wessell testified that sales were low and customers were complaining.  On at least one occasion, Wessell had to delay issuing paychecks to herself and other employees.  Wessell testified that Stone charged personal expenses to company credit cards and used company money to pay his son large amounts of money for cleaning the bathrooms, to provide his wife with a salary, to make payments on his home mortgage, and to purchase several items that were unrelated to the company's home restoration business.

Shortly thereafter, in early January, 2012, Stone called Wessell into a meeting in which the accused employee was present. At this meeting, Stone accused Wessell of lying about her reporting of work hours since her automobile accident (see note 3, supra). He demanded financial reports that were impossible for her to provide, and he ultimately demoted her from business manager, placed the accused employee in that role, and required Wessell to report to that employee.

On March 28, 2012, during a meeting with several employees including Wessell, Stone addressed their financial concerns about Mink Brook and informed them that the company was not closing but was experiencing "just a little bump in the road." Stone then named several employees who would still receive their upcoming paychecks, but he did not name Wessell. When she inquired about her paycheck, he stated that she would not receive it. Wessell responded that this was unfair and that she wanted to meet privately with Stone after the group meeting. One hour later, Wessell and Stone met privately in her office. Wessell demanded to be paid, and Stone replied that she "could afford not to get paid." The next day, March 29, 2012, Wessell again met with Stone and the accused employee. Stone stated

that Wessell was stealing money and reimbursing herself without authorization, which Wessell denied.  Stone then fired her.[8]

Wessell formally retained Welsh who, on June 19, 2012, filed the instant complaint against Mink Brook and Stone, alleging claims of nonpayment of wages and retaliatory firing in violation of the Wage Act, G. L. c. 149, §§ 148, 148A.[9]  On January 2, 2014, nearly one and one-half years after the litigation began and eleven days before trial, the defendants filed a motion to disqualify Welsh, claiming a conflict of interest given Welsh's attorney-client relationship with them.[10] One week later the trial judge, after a hearing, denied the motion.  The judge ruled that Welsh's advice to Wessell, given when she worked for Mink Brook, was informal, free, and unrelated to the issues in her complaint.  The judge concluded

---

[8] Wessell testified that she later received a check for a portion of the money that Mink Brook owed her for wages.

[9] Wessell's complaint stated that she received a right-to-sue letter from the Attorney General; this letter is not included in the record appendix, but the defendants raise no issue on this subject.  Wessell's complaint also included a quantum meruit claim that was eventually dismissed by stipulation of the parties.

[10] The matter of representation by Welsh was apparently considered by the defendants when they were defaulted in late 2012.  Counsel for the defendants told the trial judge on January 9, 2014, at the hearing on the motion to disqualify, that the default occurred because Stone considered the complaint "just an intimidation tactic," and believed that Welsh could not bring the complaint because of his prior legal assistance to Mink Brook.

that although Welsh's personal relationship with Wessell gave Mink Brook a "valuable contact," Mink Brook and Welsh never established an attorney-client relationship.[11]

On January 14, 2014, the jury found for the plaintiff and awarded damages for lost wages and unused vacation time, up to the date of her firing, of $3,750.  The jury also awarded lost compensation from the date of firing up to the date of the verdict, minus earnings from Wessell's subsequent employment elsewhere, of $54,880.90.  On January 24, 2014, the court entered an amended judgment that trebled the amount, as required under G. L. c. 149, § 150,[12] and added interest, for an award of $187,111.38.  This appeal followed.[13]

---

[11] The judge found:

> "There's a very de minimis interaction between Ms. Wessell and Mr. Welsh in terms of some of this informal advice and education on legal topics such as handicap accessibility and what to do with a competing former employee and things of that nature.  These contexts to me arise out of the personal relationship between the two.  I think he was representing Mink Brook in only the most technical sense, and certainly by going ahead and representing Ms. Wessell in this case I don't think that there is any basis for an abuse of confidential information regarding Mink Brook that he learned in the course of any of this advice.  The advice Mr. Welsh gave on these few exchanges over the course of several years were on clearly unrelated matters . . . ."

[12] The statute states, in pertinent part, "An employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation

Motion to disqualify. Denial of a motion to disqualify an attorney is reviewed for abuse of discretion. Steinert v. Steinert, 73 Mass. App. Ct. 287, 288 (2008). A moving party must show, first, that the current representation is adverse to the interests of the former client, and second that the matters of the two representations are substantially related. Slade v. Ormsby, 69 Mass. App. Ct. 542, 546 (2007), citing Adoption of Erica, 426 Mass. 55, 61 (1997). See Mass.R.Prof.C. 1.9, 426 Mass. 1342 (1998).[14]

An attorney-client relationship "may be, but need not be, express; the relationship can be implied from the conduct of the parties." Page v. Frazier, 388 Mass. 55, 62 (1983). For an implied attorney-client relationship, (1) a party must seek advice from an attorney, (2) the advice sought must be within the attorney's professional competence, and (3) the attorney

and reasonable attorneys' fees." G. L. c. 149, § 150, as amended by St. 2008, c. 80, § 5.

[13] On April 8, 2014, the court further ordered an award of Wessell's costs and attorney's fees, which together totaled about $40,000. The defendants did not file an appeal from that order, and its correctness is not before us.

[14] Rule 1.9(a) states, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." The Massachusetts Rules of Professional Conduct "specifically incorporate" the substantial relationship test. Adoption of Erica, 426 Mass. at 61.

agrees to give, or actually gives, the advice. DeVaux v. American Home Assur. Co., 387 Mass. 814, 818 (1983). Additionally, "the question whether there was an attorney-client relationship depends on the reasonableness of the [complaining party's] reliance." Id. at 819.

For matters to be "substantially related," courts have consistently found that counsel must possess confidential information that could be used against the former client in the current representation. See Masiello v. Perini Corp., 394 Mass. 842, 847-850 (1985); Adoption of Erica, 426 Mass. at 63.[15] When determining whether matters are substantially related, a judge should make a factual determination by comparing "the overlap and similarity" between the former and current representations. Slade v. Ormsby, 69 Mass. App. Ct. at 547.[16]

Courts discourage "eleventh hour maneuvers" to disqualify opposing counsel where the moving party has advance notice of the representation by opposing counsel but waits to raise the issue until the eve of trial. Masiello v. Perini Corp., 394 Mass. at 850. Such tactics "are disruptive to the efficient

---

[15] One can envision a scenario where matters are substantially related despite a lack of confidential information. Such is not the case here.

[16] "[T]he exact parameters" of when two matters are substantially related has not been delineated in the case law. Slade v. Ormsby, 69 Mass. App. Ct. at 547 n.11, citing Adoption of Erica, 426 Mass. at 62.

administration of justice and are costly." Ibid. "Court resources are sorely taxed by the . . . use of disqualification motions as harassment and dilatory tactics." Gorovitz v. Planning Bd. of Nantucket, 394 Mass. 246, 250 n.7 (1985).

Here, even if an attorney-client relationship existed between Welsh and the defendants, the judge properly denied the motion to disqualify because Welsh's services, including his advice on handicap accessibility and review of certain letters, never involved matters "substantially related" to Wessell's Wage Act dispute. See Slade v. Ormsby, 69 Mass. App. Ct. at 546. Although Welsh advised Wessell on specific Mink Brook employee matters, those matters were not substantially related to Wessell's complaint because there was no overlap or similarity. See id. at 547. Also, Welsh never gained confidential information in the prior matters that disadvantaged Mink Brook at trial here.[17] See Masiello v. Perini Corp., 394 Mass. at 847-850; Adoption of Erica, 426 Mass. at 63.[18]

---

[17] Regarding the employee handbook that Welsh was alleged to have helped to create for Mink Brook, the judge found the defendants' contention to be an "overstatement."

[18] While Welsh infrequently gave uncompensated legal advice to Wessell, the defendants and Welsh never expressly created any formal representation agreement. See Page v. Frazier, 388 Mass. at 62. Additionally, while a closer question, they never formed an implied agreement. Even though Wessell sought and obtained advice from Welsh that was within his professional competence, and for the purpose of furthering Mink Brook's interests, Mink Brook could not reasonably have concluded that based on this

Lastly, as the judge noted before trial, the defendants' motion had all the indications of being an "eleventh hour maneuver[]" to disqualify opposing counsel despite numerous opportunities before trial to raise the objection. <u>Masiello</u> v. <u>Perini Corp</u>., 394 Mass. at 850. The defendants filed their motion on the eve of trial, about one and one-half years after Wessell's complaint. Without a sufficient explanation for the extraordinary delay,[19] the motion was properly denied not only as without merit but also as a dilatory tactic.

<u>Damages under Wage Act</u>. The defendants argue that the judge erred when he instructed the jury that they could award the plaintiff compensatory damages ("back pay") for a violation of the Wage Act, specifically for a retaliatory firing prohibited under G. L. c. 149, § 148A.[20] They maintain that one

---

infrequent, informal, and free advice that Welsh represented the company. See <u>DeVaux</u> v. <u>American Home Assur. Co</u>., 387 Mass. at 818-819.

[19] At oral argument, counsel for the defendants explained that the original claim was for a minimal amount, and there was a belief that the matter would be settled prior to trial. (Indeed, during the hearing on the disqualification motion, defense counsel told the judge that "there was always a hope that it would settle or resolve, or it would just go away at some point.") Even so, that belief had to dissipate as the trial date approached.

[20] The judge instructed the jury that "if you find that Ms. Wessell was terminated unlawfully from making a complaint regarding the Wage Act, then she is entitled to damages of the amount she would have earned if she had not been wrongfully

who violates § 148A "shall be punished or shall be subject to a civil citation or order as provided in [G. L. c. 149, §] 27C," only, and that § 148A does not enable a private individual to obtain compensatory damages because the criminal and civil penalties in § 27C are the exclusive remedy, enforceable by the Attorney General only, for § 148A violations.[21]

The Wage Act has interrelated mechanisms to ensure that employees are timely paid and protected when that right is asserted.  Under G. L. c. 149, § 148, as amended by St. 1992, c. 133, § 502, an employer "shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . ." The first paragraph of G. L. c. 149, § 148A, inserted by

---

discharged from the date of her termination, forward to this date."

[21] The second paragraph of § 148A, which the defendants cite as support for their argument, states,

> "Any employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint to the attorney general or any other person, or assists the attorney general in any investigation under this chapter, or has instituted, or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceedings, shall have violated this section and shall be punished or shall be subject to a civil citation or order as provided in section 27C."

G. L. c. 149, § 148A, as amended by St. 1999, c. 127, § 144.

St. 1977, c. 590, mandates that "[n]o employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter." Completing the circle, G. L. c. 149, § 150, authorizes an employee faced with a violation of § 148 or § 148A to bring a civil action "for any damages incurred, and for any lost wages and other benefits."[22] See Fernandes v. Attleboro Hous. Authy., 470 Mass. 117, 126-127 (2014).

The defendants' view, that the remedy under § 148A is limited to criminal and civil penalties and not damages from the date of retaliation up to the date of judgment, is overly restrictive, essentially ignores G. L. c. 149, § 150, and leaves those aggrieved with no option other than a complaint to, and action by, the Attorney General. The Wage Act, when read as a whole to ensure payment and to protect employees who assert that right, does not support the defendants' assertion that the § 27C

_____

[22] "An employee claiming to be aggrieved by a violation of [§ 148, § 148A, or other specified sections] may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute . . . a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits." G. L. c. 149, § 150, as amended by St. 2008, c. 80, § 5. (We note that the 2014 amendments to § 150, even had they not postdated the events at issue in this litigation, did not change the language applicable here. See St. 2014, c. 260, § 11; St. 2014, c. 292, § 1.)

language is exclusive and only allows actions by the Attorney General.  In so arguing, the defendants ignore the authorization in § 150 for a private cause of action for retaliation prohibited by the first paragraph of § 148A.

In sum, read in totality, for wage claims under § 148, an employee may recover earned wages that an employer has withheld. For retaliation claims under § 148A, an employee terminated by an employer for asserting a wage right may recover damages stemming from the termination.  Damages for retaliation may include earnings from the date of termination up to trial.  See Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 379 (1st Cir. 2004) ("An award of back pay compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment").[23]

Here, the defendants' retaliatory firing of Wessell violated § 148A, which triggered Wessell's § 150 remedy for

---

[23] While the defendants failed to object after the judge delivered his final instructions to the jury, it appears that defense counsel throughout challenged the back pay jury instruction.  At a precharge hearing, defense counsel objected to the proposed instruction, and the judge acknowledged his objection.  Although a judge may save or preserve rights at an earlier time that might, in some circumstances, excuse the need for a timely objection later, "we discourage the practice." Commonwealth v. Almele, 87 Mass. App. Ct. 218, 224 (2015).  See Rotkiewicz v. Sadowsky, 431 Mass. 748, 751 (2000), citing Flood v. Southland Corp., 416 Mass. 62, 66-67 (1993).  See also id. at 67 ("Cautious counsel, however, wisely will renew any earlier objection with specificity after the charge unless the judge then instructs otherwise"); Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974).

recovery of "any damages incurred, and . . . any lost wages and other benefits."  The judge correctly instructed the jury that if they found that the defendants fired Wessell in retaliation, the jury could award her damages based on her earnings from the date of her termination until the date of the jury's decision. See Fernandes v. Attleboro Hous. Authy., 470 Mass. at 130 & n.11.

Amended judgment affirmed.